Paul D. Graves, J.
Plaintiffs, in each of the five above-entitled actions, were owners of lands appropriated in the name of the State by the defendant Superintendent of Public Works at the request of, and for use by, the defendant Power Authority. The appropriations were made pursuant to subdivision 10 of section 1007 of the Public Authorities Law, and section 30 of the Highway Law. In these actions plaintiffs seek to have part of their property restored. Defendants, by the present motions, attack the complaints for legal insufficiency.
The lands of each plaintiff now lie immediately adjacent to the banks of the Saint Lawrence as it presently flows. With the erection of Barnhart Island and Long Sault dams, the power pool then created will cause the river to rise and flood some portions of the property of these plaintiffs. The pool, as an engineering matter, is expected to settle at or about the contour elevation 242 feet above sea level. Engineering estimates state that the elevation of 246 feet represents the “ minimum clearing point ” needed for the power project to operate in its completed stage.
Most of these factors are more easily understood by reference to the map (hereinafter referred to as the “ primary map ”), which was used by defendants upon the oral argument without objection from plaintiffs’ counsel. (Property Map; Town of Louisville; Saint Lawrence Power Project; Power Authority of the State of New York, Uhl, Hall and Rich, Engineers; May 3, 1956.) Accordingly, the court deems it appropriate to refer to this pictorial illustration in its decision.
From this primary map it will be noted the area shaded in blue represents the 246 level; the area shaded in yellow being lands above 246, but not in dispute; and the lands shaded in green being those above 246, and which are the subject of these actions.
As a result of the flooding, the Cuglars ’ disputed lands will be in two pieces, approximately one third being part of a newly formed island, and the remaining portion, a peninsula jutting into the power pool; the Wareing-Carter property, part of the same new island; the Whalen land part of this island; the Becker lands part of the new island; and the Stewart lands, in three pieces, two of which will be parts of other newly formed islands, and the remainder contiguous to the new shore line. In all instances, the taking has been to existing boundaries or lot lines.
*882 The gist of each action is that the appropriation above the 246 elevation was for the purpose of using the property so acquired for sale or lease to private individuals, and for residential, recreational, business, commercial and other private purposes. More specifically, the complaints, with the exception of the Stewart action, allege the Power Authority intends to use the property above 246 as part of a real estate project to be known as the “ Wilson Hill Development ”. It is further alleged, in detail, the Authority proposes to lay out and lease to private individuals numerous lots, furnish space for commercial enterprises, an area for resettlement of dispossessed campers and permanent residents, for the construction of roads, public parks, water and sewage facilities, and a causeway to the newly created island; that all these proposals are “useless” and “ unnecessary ” for navigation, commerce, and power, and as such, violate the eminent domain and due process clauses of our State and Federal Constitutions.
As a source of their information and beliefs, as to the plans and intentions of the Authority, plaintiffs refer to a map of the Wilson Hill project and statements contained in brochures issued by the Authority under dates of December, 1954, July, 1955, and December, 1955; resolutions of the Authority adopted October 17, 1955 and November 10, 1955, and “conversations ” had by plaintiffs with various officers and agents of the defendants. The substance such conversations are not included. Further facts are alleged stating employees of the defendants have already entered upon plaintiffs’ lands.
Attached to the complaint in the Cuglar action is a description of plaintiffs’ three parcels which apparently total 244.65 acres; the appropriation Map No. 720 (which refers to the Cuglar parcels as numbers 724, 725, 728), and the notice of appropriation wherein it is stated the Authority “ deems necessary ” the acquisition of these lands, ‘ ‘ for the improvement and development of the International Rapids Section of the Saint Lawrence river.”
The three brochures are essentially reports of Authority consultants and engineers stated in simplified terms. Each, however, contains a foreword by the chairman of the trustees from which the plans of the Authority may be generally observed. The engineering data then following is equally significant.
In the first brochure of December, 1954, the general intent of the Authority, as it then related to these lands in dispute, may be seen from the language of the chairman at page one:
*883 Since our initial August 10th report, we have continued our studies of recreation, housing, highway and related facilities and some changes have resulted due largely to the establishment of the Seaway Development Corporation and the joint planning which resulted. * * *
At the outset, it is our purpose that recreation and living facilities on the river front which must be flooded, now enjoyed by local residents be replaced insofar as possible on substantial vacant land properly planned and located, and provided with public docking and other facilities. We have outlined a method by which many homes can be saved and relocated so as to provide future enjoyment of the expanded water front. * * * The program will
be somewhat similar to that adopted by the Jones Beach Parkway Authority and used successfully on the widening of the Southern State Parkway and the extension of the Meadowbrook Parkway. Boating facilities will be planned for this area as well as local recreation facilities.
Later, on page four, and as part of the engineering study, the so-called “ Bradford Point Development ” is outlined in its general aspects. It is important to note however, that while this development would have included plaintiffs’ lands, the project, from an engineering standpoint, was revised and the construction of dikes in the general area abandoned. The “ Bradford Point Development ” would not have produced an island; the “ Wilson Hill ” project, with the dikes deleted, does.
In the second brochure, the foreword states:
Among the considerations affecting land acquisition which must influence our decision are the lake and river levels and navigation requirements which are under general supervision of International agencies, the conditions of the license issued by the Federal Power Commission, need of land for the deposit of huge amounts of channel excavation, our contract with the bondholders and operating arrangements in regulating flow through the powerhouse to be worked out with our partner, Ontario Hydro. It must be borne in mind that Ontario Hydro has problems peculiar to the Canadian side of the border. These considerations like the general principles mentioned before, lead to the same conclusion, namely, that we must take sufficient land at the outset to meet all possible needs and to avoid future disputes and claims. Within limits determined on these principles and considerations we aim, where feasible, to give owners access to new water levels consistent with fee ownership by the State and permits or easements carefully limited by future power and seaway needs.
The “ Engineers Report”, following this foreword, sets forth the “ recommended criteria ” to be used in acquiring property. Here is established the ‘ ‘ minimum clearing elevation ’ ’ at 246 feet, and the further norm that ‘ ‘ whenever appropriate, taking along the reservoir will be to existing property lines or highways.”
In addition however, this ‘ ‘ Engineers Report ’ ’ contains the following passages which may shed some light:
As indicated in the December 1954 report some cottagers and home owners may be unable to find suitable sites at a reasonable figure on which to relocate their dwellings. The plan for relocating buildings contained in the December *884 report must now be revised due to changes in construction requirements for dikes. If the need for additional areas becomes evident they can be made available.
One of the purposes -of the Saint Lawrence project and a requirement of the license is the promotion of recreation. * * *
The final category of land acquisition involves river frontage not required for construction purposes but needed because of raised water levels or for protection from flooding. Most of this property will be permanently flooded and will be under the pool created by the construction of the powerhouse, dams and dikes. The remainder is required to enable proper regulation of the river, pursuant to the criteria laid down by the International Joint Commission and the International Joint Board of Control, and for manipulation of the pool to develop maximum firm power, maintenance of river control gauges, protection of river banks and otherwise for control of the river as required by the license. It should be borne in mind that the final method of regulation of the River and Lake Ontario has not yet been officially promulgated and since some fluctuation of levels may result in the future because of subsequent changes in regulation methods, designs, of necessity, must cover all assumptions. * * *
It is the unanimous opinion of the staff and waterfront consultants that river frontage should be owned in fee by the Power Authority and that limited reservations be made to upland owners, cut off from the river by the Authority, for access to the river from upland property. The Authority must retain jurisdiction over this area and cannot be placed in the position of acquiring insufficient rights which might have to be augmented later at additional cost to the Authority.
The third and last brochure dated December, 1955 contains the following excerpts from the foreword by the Authority chairman, which the court deems of some significance:
We previously announced plans for the relocation of cottages and homes in eases where the owners ask such assistance and where it is practical to move the buildings. Our program will result in moving a considerable number of cottages to large plots desirably located overlooking the River. We shall provide roads and utilities and lease the plots for a twenty-year period on reasonable terms. Each cottage will have its own frontage on the River. ■Sr Sí' Sr
The land acquisition procedures for seaway and power involve the co-operation of various State agencies including the Attorney General’s office, the Comptroller’s office and the Department of Public Works. Also involved are the International Joint Commission, International Joint Board of Engineers, International Joint Board of Control, Bureau of Customs, Immigration and Naturalization Service and others. It is a complex administrative machine not easily kept in continuous, smooth and frictionless operation. It is perhaps the largest co-operative venture of this kind ever attempted.
Since the reorganization of the Authority in April 1954, we have been beset by requests from local communities along the Saint Lawrence to relieve them of responsibilities resulting from the rapid expansion of activities in the area * * *
Certain problems, some of which are annual and others of a non-recurring type, are bound to follow. There is no mystery as to our policy. We have made it quite clear that we do not propose to assume the normal operating expenses of the local communities * * *
*885 As to some of the more permanent improvements requiring large capital outlays, such as the baclly needed sewage disposal plant in Massena, we can be of considerable help. For instance, we have agreed to underwrite a large share of the cost of construction of the sewage disposal plant and are providing a new water intake in the Massena works with substantial conduits to deliver water to Alcoa and Massena. With the cooperation of the Saint Lawrence Seaway Corporation, we have repaired miles of roads and are constructing a new highway from Route 37 to Canada including a new bridge across the Grasse River.
Finally, the Authority reiterates that its objective is not only to generate low cost power and to help build the new Seaway, but to conserve the natural beauty of this magnificient River and to promote the healthy development of the entire frontage for industry, residence and recreation.
Immediately following is the “ Consultant’s Report ” which, on pages 16 and 17, shows by map that part of Wilson Hill which will become wholly an island. In addition, the project itself is thus described:
WILSON HILL DEVELOPMENT. Inasmuch as a large number of homes and cottages, situated along the present shore of the River, will be affected by the raising of the water in the Saint Lawrence River to form the power pool, the Authority will develop an area now known as Wilson Hill and situated about halfway between Massena and Waddington, where many of these buildings may be relocated.
The Wilson Hill area will become an island when the water level of the River is raised and for this reason the Authority must own and control it for the protection of the project works. Access will be provided by the construction of a causeway.
There is sufficient space for approximately 200 lake front properties, including at least two small community park areas. Additional sites can be provided at Wilson Hill having convenient access to the River in common with others. The Authority will lease these plots, build the necessary roads, water and sanitary facilities and arrange for moving buildings where economically feasible from the areas to be flooded to the new site. (Pages 5, 6, 7.)
Apart from “ conversations had with several of the officers and agents of the defendants ” (pars. 12, 17), which allegation in and of itself can scarcely be held sufficient to sustain these complaints, there remains, as a source of plaintiffs’ information and belief, two resolutions of the Authority dated October 17, 1955 and November 10, 1955. Each was adopted following a report to the trustees by the chairman. Generally speaking, these resolutions reaffirm and formalize the policy of the Author-, ity to aid in the relocation of homes and cottages, and approve ‘ ‘ in principle ’ ’ a plan ‘ ‘ For the Redevelopment of Wilson Hill”.
More specifically the report and resolution of October 17, 1955 refers to the project plan developed by Clarke and Rapuano showing Wilson Hill as a location to which approximately 200 homes and cottages can be relocated; that in negotiating with *886 former owners, each will be offered 20-year leases of their homes, as a part of the settlement, and 20-year leases for new sites, which will have access to the river by easement; that the Authority will construct a road, provide water and electrical service in the housing area, and make arrangements (in cases where the owners request it) with movers for relocation of these buildings to the new sites.
The second resolution of November 10, 1955 (based on the chairman’s report of the prior November 4) refers to conferences relative to the relocation of homes along the river with other State agencies, Canadian groups interested in their similar problem, and with a professional house mover. The policy of the Authority to assist dispossessed families is again reaffirmed; it is stated new lots will be made available on Wilson Hill; that present buildings will either be moved, or, if the owner is not so interested, then offered to others whose building may not be worth moving; that it will be the policy of the Authority to first concentrate on the Wilson Hill project, but in the meantime investigate other possible sites in the event Wilson Hill is not sufficiently large; that the new sites will be made available on the basis of a 20-year lease terminating in 1980, although (here a change in policy) title to each house will be vested in the former owner who will be subject to the payment of taxes thereon; that at the end of the leasehold period the owner may retain possession of his building in the event the lease is not renewed and he desires to remove it; that after appropriation, the home or cottage will be resold to its owner who may move it where he chooses, or to a lot leased him by the Authority; that the Authority will supervise the transfer of all buildings to the new leasehold sites, although the cost is to be deducted from the awards; that the Authority proposes to contract in the spring of 1956 for construction of a causeway, roads, water system, and sanitary facilities in the Wilson Hill development, wherein recreation areas will likewise be included; that the cost of all service facilities will be amortized on a 20-year basis and returned to the Authority in the form of rent.
The basic theory of each action is that, beyond or above the contour line 246, defendants continue to trespass upon plaintiffs’ lands. As the result, each complaint seeks judgment, (1) permanently enjoining defendants from entering upon those parts of the appropriated premises having an elevation of more than 246 feet; (2) declaring said appropriations unconstitutional, unauthorized, illegal and void; (3) setting aside, vacating and annulling all descriptions, maps, notices, and other *887 instruments in connection with the appropriations, and (4) temporarily restraining defendants.
Oral arguments were made and briefs submitted only in connection with the action brought by Daniel Cuglar and his wife. It is defendants’ motions in reference thereto which will be considered, although counsel agree the disposition of the motions in the Cuglar case will be determinative of the similar motions made in the remaining actions. Any controlling or factual difference which arise from the other four complaints will be later referred to in such fashion as the court deems significant.
Presently to be considered are defendants’ motions to dismiss under subdivision 4 of rule 106 of the Rules of Civil Practice on the ground it appears on the face thereof the complaint does not state facts sufficient to constitute a cause of action, or, in the alternative, to strike out certain enumerated paragraphs or allegations under rule 103.
In considering these motions, the court is mindful a pleading challenged for legal insufficiency should be construed broadly and liberally. (Wainwright & Page, Inc., v. Burr & McAuley, Inc., 272 N. Y. 130; Condon v. Associated, Hosp. Service, 287 N- Y. 411, 414.) Moreover, the court will accept “ as true the material allegations of fact contained in the complaint and any reasonable inference that may be drawn therefrom (Garvin v. Garvin, 306 N. Y. 118, 120; Locke v. Pembroke, 280 N. Y. 430, 432; also cf. Denihan Enterprises v. O 'Dwyer, 302 N. Y. 451, 458.) However, it does not assume the truth of any legal conclusions drawn by the pleader nor the pleader’s interpretation of any statutes involved. (Kip v. New York & Harlem R. R. Co., 67 N. Y. 227, 230; McCormick v. Westchester Light. Co., 142 Misc. 27.)
Within the meaning of these concepts, it seems fair to say this complaint asserts three fundamental positions. First, that defendants have entered upon those portions of plaintiffs’ lands above the contour line 246 without legal right or statutory authority; second, that all appropriation of property above or beyond this line constitutes an acquisition for private uses; and thirdly, that the taking above 246 is excessive. Necessarily, these lines of attack have a tendency to blend, one to the other, and overlap as to possible legal consequences. However, counsel in their oral arguments and briefs have addressed themselves to these issues, and hence the court will dispose of the motions in the same fashion.
First arising then is the question as to whether or not defendants were authorized by law or by statute to acquire these *888 lands in dispute. This in turn demands close scrutiny of the legislative acts whereby the Power Authority came into being as a creature of the sovereign State, and the rights and powers, and the correlative duties and obligations, vested with it. Also necessary to examine are the provisions of the license, granted by the Federal Power Commission, which gave this agency the opportunity to fulfill its statutory mission.
The preamble or “ Declaration of policy ” contained in the Power Authority Act (L. 1931, ch. 772; L. 1939, ch. 870, as amd. by L. 1951, ch. 146, L. 1954, ch. 822, L. 1955, ch. 865) provides as follows (Public Authorities Law [Consolidated Laws, ch. 43-A], § 1001):
Those parts of the Niagara and Saint Lawrence rivers within the boundaries of the state of New York are hereby declared to be natural resources of the state for the use and development of commerce and navigation in the interest of the people of this state and the United States. In order to provide for the most beneficial use of these natural resources, for the creation and development of hydroelectric power in the interest of the people of this state, and to preserve and enhance the scenic beauty of the Niagara Falls and river, such natural resources, including the beds and waters of the said rivers as instrumentalities of commerce and navigation, and the beds, water, power and power sites in, upon or adjacent to or within the watersheds of the said rivers, owned or controlled by the people of the state, or which may hereafter be recovered by or come within their ownership, possession and control, shall always remain inalienable to, and ownership, possession and control thereof shall always be vested in, the people of the state.
Following is section 1002 which creates the Power Authority as a “ corporate municipal instrumentality of the state
Section 1005 enumerates the powers and duties of the Authority, and the pertinent portions of such grant are in the following language:
Forthwith upon the appointment and organization of the trustees and subject to the conditions and limitations in this title contained, the authority, in cooperation with the proper Canadian authorities and those of the United States as hereinafter directed, shall proceed with the improvement and development of the Niagara river and the international rapids section of the Saint Lawrence river (which is defined as that part of the said river from Ogdensburg to the point where it leaves the territory of this state) for the aid and benefit of commerce and navigation and for the development of the hydro-electric power inherent therein in accordance with the provisions of this title.
The authority is authorized and directed: * * *
3. To apply to the appropriate agencies and officials of the United States government and/or of the Dominion of Canada or its provinces, including the federal power commission and the international joint commission, for such licenses, permits or approval of its plans or projects as it may deem necessary or advisable, and in its discretion, and upon such terms and conditions as it may deem appropriate, to accept such licenses, permits or approvals as may be tendered to it by such agencies or officials; and to enter into contracts *889 with such agencies or officials relating to the construction or operation of the projects. Neither the authority nor any trustee, officer or agent thereof shall have any power to waive or surrender for any purpose whatsoever any right of the state of New York, whether sovereign or proprietary in character, in and to. the Niagara and Saint Lawrence rivers, their waters, power, channels, beds, or uses, or the right of the state to assert such rights at any future time; provided, however, that nothing herein contained shall be construed as limiting the power of the authority to accept a license issued by the federal power commission pursuant to the provisions of the federal power act, as amended, and the terms and condtions therein imposed pursuant to law. * * *
5. To develop, maintain, manage and operate those parts of the projects owned or controlled by it in such manner as to give effect to the policy hereby declared * * namely, that the projects shall be in all respects for the aid, improvement, and benefit of commerce and navigation in, through, along and past the Niagara river, the Saint Lawrence river and the international rapids section thereof * * *
7. To proceed with the physical construction of any project authorized by this title, including the erection of the necessary dams, power houses and other facilities, instrumentalities and things necessary or convenient to that end * * *
8. To exercise all the powers necessary or convenient to carry out and effectuate the purposes and provisions of this title; and as incidental thereto to own, lease, build, operate, maintain and dispose of real and personal property of every kind and character, to acquire real property and any or every interest therein for its lawful purposes by purchase, or by condemnation * * * and generally to do any and every thing necessary or convenient to carry out the purposes of this title, provided that the authority shall have no power at any time to pledge the credit of the state nor shall any of its obligations or securities be deemed to be obligations of the state nor shall the authority have the power to lease or sell any dam, or power house at the site.
The right of the Authority to acquire property by appropriation is conferred by section 1007 which, as to its provisions presently significant, provides:
If, for any of the purposes hereunder, including temporary construction purposes and the making of additions or improvements, the authority shall find it necessary or convenient for it to acquire any real property as herein defined, whether for immediate or future use, then the authority may find and determine that such property is required for a public use, and upon such due determination, such property shall be and shall be deemed to be required for such public use until otherwise determined by the authority * * *
10. The authority may determine what real property is reasonably necessary for the improvement and development of the international rapids section of the St. Lawrence river. If funds are made available * * * the superintendent of public works, when requested by the authority, shall acquire such real property in the name of the state by appropriation and, * * * according to the procedure provided by section thirty of the highway law, insofar as the same may be applicable. * * *
Claims for the value of the property appropriated and for legal damages caused by any such appropriation shall be adjusted and determined by the superintendent with the approval of the authority, or by the court of claims as provided in said section thirty. * * *
*890 The Authority may determine whether any property appropriated pursuant to this section, while under its jurisdiction, should be sold or exchanged in whole or in part, on terms beneficial to the state and the authority, and in all cases where such a determination is made, the authority may sell or exchange such property. Where the authority finds it practicable and reasonable, the former owner, from whom the property was appropriated, his heirs, successors in interest and assigns, shall be given the first opportunity to purchase such property at its fair market value.
Ill that the Authority is given the right to acquire lands in the name of the State, the sovereign by section 1008 consents the Authority may exercise rights in connection therewith. In so doing, it was provided:
The state of New York hereby consents to the occupation and use by the authority of any and all property of the state of whatever kind or character on the Niagara river or within the international rapids section of the Saint Lawrence river, and hereby vests the authority with and delegates to it the right to exercise any and every right and power of the state in connection therewith, whether proprietary or sovereign in character, which the state itself might exercise * * *.
And lastly section 1012 may be considered insofar as its wording purports to deal with matters of policy in carrying out the provisions of the act. Such language states:
It is hereby found and declared that the projects authorized by this title are for the aid and improvement of commerce and navigation and that such aid and improvement of commerce and navigation and the development, sale and distribution of hydro-electric power is primarily for the benefit of the people of the state of New York, for the improvement of their health and welfare and material prosperity, and is a public purpose, and the authority shall be regarded as performing a governmental function in undertaking such projects and in carrying out the provisions of this title, and shall be required to pay no taxes or assessments upon any of the property acquired * * *.
Section 30 of the Highway Law provides the mechanics of land acquisition such as the preparation of descriptions and maps, filing with the Department of Public Works and the Department of State, upon completion of which “ the appropriation by the state of the property described * * * shall be deemed complete and the title to such property shall be vested ”.
Apart from these basic sections, it is likewise important to consider the terms and conditions of the license granted by the Federal Power Commission, for the reason subdivision 3 of section 1005 {supra) specifically authorizes and directs the Authority to apply to the commission for a development license and general approval of its plans, and ‘ ‘ to accept such licenses, permits or approvals as may be tendered * * * upon such terms and conditions as it may deem appropriate ”.
*891 In the license issued the Authority (In the Matter of the Power Authority of the State of N. Y.; Project No. 2000; Opinion No. 255, and Order Issuing License For Major Project; Issued July 15, 1953; U. S. Federal Power Comm.), it is provided, in part, as follows:
The Power Authority, an agency of the State of New York, proposes to construct and operate the Long Sault Dam near Massena, New York, connecting the mainland with the upstream end of Barnhart Island and to be located entirely within the United States; a power house which would also act as a dam to be constructed from the foot of Barnhart Island to the midpoint of the main channel of the Saint Lawrence River, which midpoint is the boundary line ¡between the United States and Canada; and that portion of the Iriquois Dam located on the United States side of the river some 27 miles upstream from the Long Sault Dam. The Power Authority also proposes to make certain channel improvements and to construct other works necessary on the United States side for the operation of its project, (pp. 2, 3.) * * *
With the conditions which we are including the license, we conclude that the project proposed by the Power Authority will be best adapted to a comprehensive plan of development for the Saint Lawrence River and that it is in the public interest that construction of the project should be started and completed as soon as practicable. The Commission further finds: (p. 14)
(3) The proposed project would consist of:
A. All land within the United States constituting the project area an cl enclosed by the project boundary or the limits of which are otherwise defined, or interests in such lands necessary or appropriate for the purposes of the project, whether such lands or interests therein are owned or held by the applicant or by the United States; * * *
B. * * * a reservoir with the maximum normal pool level at elevation 238 feet for initial operation and at elevation 242 feet after a test period of ten years or less; and appurtenant works and facilities: * * * (p. 15)
(15) Upon the terms and conditions hereinafter imposed, the proposed Project No. 2000 is best adapted to a comprehensive plan for the improvement and utilization of the International Rapids Section of the Saint Lawrence River for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public use, including recreational purposes, (p. 18) * * *
(28) The applicant has shown satisfactory evidence of compliance with the requirements of the laws of the State of New York with respect to bed and banks, and to the appropriation and diversion on use of water for power purposes, and with respect to the right to engage in the business of developing, transmitting, and distributing power, and in any other business necessary to effect the purposes of a license under the Act. (p. 20) * * *
The Commission orders'.
(A) This license is issued to the Power Authority of the State of New York * * * under Section 4(3) of the Federal Power Act for a period of 50 years, * * *
(B) This license shall also be subject to the following terms and conditions: (p. 21) * * *
Article 6. For the purpose of determining the state and flow of the stream or streams * * *, the Licensee shall install and thereafter maintain such gages and stream-gaging stations as the Commission may deem necessary and best adapted to the requirements; * * *. The number, character, and *892 location of gages, meters, or other measuring devices, * * * may be altered from time to time if necessary to secure adequate determinations, (p. 23)
Article 7. So far as is consistent with proper operation of the project, the Licensee shall allow the public free access, to a reasonable extent, to project waters and adjacent lands owned by the Licensee for the purpose of full public utilization of such lands and waters for navigation and recreational purposes, including fishing and hunting, and shall allow for such purposes the construction of access roads, wharves, landings, and other facilities on its lands the occupancy of which may in appropriate circumstances be subject to payment of rent to the Licensee in a reasonable amount: Provided, that the Licensee may reserve from public access such portions of the project waters, adjacent lands, and project facilities as may be necessary for the protection of life, health, and property and, Provided further, that the Licensee’s consent to the construction of access roads, wharves, landings, and other facilities shall not without its express agreement place upon the Licensee any obligation to construct or maintain such facilities, (pp. 23, 24) * * *
Article 13. The United States specifically retains and safeguards the right to use water in such amount, to be determined by the Secretary of the Army, as may be necessary for the purposes of navigation * * *; and the operations of the Licensee so far as they affect * * * waters affected by the license, shall at all times be controlled by such reasonable rules * * * as the Secretary of the Army may prescribe in the interest of navigation, and as the Commission may prescribe for the protection of life, health, and property, and in the interest of the fullest practicable conservation and utilization of such waters for power purposes and for other beneficial public uses, including recreational purposes; and the Licensee shall release water * * * as the Secretary of the Army may prescribe in the interest of navigation, or as the Commission may prescribe for the other purposes hereinbefore mentioned, (p. 25) * * *
Article 25. Unless otherwise ordered by the Commission after further consideration of the reduction in state to elevation 238, the Licensee shall, prior to flooding the reservoir, clear all lands in the bottom and margin of the reservoir below elevation 249 feet, from Chimney Point to the Barnhart Island powerhouse, and shall dispose of all temporary structures, * * * The clearing of the lands and the disposal of the material shall be done with due diligence and to the satisfaction of the authorized representative of the Commission.
“ All the provisions, terms, and conditions of this license ” were formally accepted by the Authority on November 3, 1953.
As they relate to the present action, it seems undeniable the Authority has received an extensive grant of powers for the purpose of undertaking and executing a vast project in the public interest. Moreover, the provisions of the act, including its declaration of policy as well, must be read and considered as an integrated whole, (together with the terms of the license), if one is to determine the true scope of this agency’s power.
In his oral argument and brief, plaintiffs’ counsel laid great stress on the fact that, ‘ ‘ for the improvement and development of the International Rapids Section of the Saint Lawrence River ” (the stated reason for the appropriation, see complaint, Exh. 3), sanction may be given to only those projects which *893 directly, and in terms, relate to “ the trinity of navigation, commerce and power But this narrow construction must be rejected unless the court is to close its eyes to the long history of the public debate, in reference to the development of this area, which has taken place during the past 50 years at both national and State levels. As early as January, 1907 the late Charles E. Hughes, as Governor of New York, urged in his annual message to the Legislature that safeguarding action be taken toward the conservation and development of water power resources, for the reason, as he stated, “ It would be difficult to exaggerate the advantages which may ultimately accrue from these great resources of power if the common right is duly safeguarded ” (Public Paper of Governor Hughes, 1907, p. 37; see, also, Special Message, p. 49). While it is true the “Declaration of policy” (§ 1001) does not spell out or refer to each and every power, and implied power, which the trustees may exercise, yet it cannot he said the scope, immensity or effects of this development, both in the International Rapids section and the heartlands as well, were totally unforeseen. To assert all consequences were clearly kept in mind at the time this act was approved, and that broad powers were thus deliberately withheld, is to argue for a proposition which has little historical basis in fact. On the contrary, it seems more reasonable to determine the results of the development were to he so far-reaching that it was neither feasible nor practicable to attempt a grant of powers except in broadest terms.
Indeed, the passage of the Power Authority Act in 1931 represented the culmination of a long and bitter struggle in this State between the forces of public and private development. It is probably true the primary purpose of the act, at the time of its adoption, was to establish, once and for all, that the vast power resources then existing in the Niagara and Saint Lawrence rivers were to ‘1 always remain inalienable to, and ownership, possession and control thereof * * * in the people of the state.” (As to a prior attempt by private interests to capture this resource, see and cf. Matter of Long Sault Development Co. v. Kennedy, 158 App. Div. 398, affd. 212 N. Y. 1, writ of error dismissed 242 U. S. 272.)
The Federal struggle, yet to come, for approval of the dual development (the power project and the deep seaway as well), was to occupy many more years. Because of intense opposition from the gulf and seaboard States, approval of the joint treaty between this Country and Canada never received Senate approval. By virtue of a later severance of these two projects, and the fresh approach by this State seeking a license from *894 the Federal Power Commission, and approval by the International Joint Commission, it was possible to circumvent approval of the United States Senate and thus bring development to the construction stage. (Cf. Federal Power Comm. Opinion No. 255, supra, pp. 3, 4.)
These historical recitals are scarcely pertinent except insofar as they may have a bearing upon the legislative intent existing at the time of the passage of the act. But if actual construction was to be years in the future (and no one foresaw matters otherwise), it is reasonable to construe the preamble of the act (and the section following), as establishing two principles, namely, that the remaining power resources of these major rivers were to be the inalienable rights of all the people, and secondly, that these rights were to be reposed in an Authority having the broadest of powers for the reason a detailed grant could not, at that time, be reasonably anticipated or described. The court concludes therefore, that the words “ navigation, commerce and power ” are not to be narrowly construed, but at least, should be read in the light of the specific grant of powers conferred by later sections of the act.
Here too the language consistently seems of broadest import. In the enumeration of the powers conferred (§ 1005, supra), the Authority is not only ‘ ‘ authorized ’ ’ but ‘ ‘ directed ’ ’ to co-operate with all Canadian and United States authorities and to apply to the Federal Power Commission for a license and approval of plans upon such terms and conditions as the Authority may deem appropriate, and to accept a development license upon any terms therein imposed. Further, the Authority is also directed to proceed with the construction of any authorized project, including the erection of the necessary dams', powerhouses and other facilities, instrumentalities and things necessary or convenient. Especially significant is the language which permits the Authority to exercise all powers necessary or convenient to carry out or give effect to the purposes stated in the act, and “ as incidental thereto to own, lease, build, operate, maintain and dispose of real and personal property of every kind and character * * * and generally to do any and every thing necessary or convenient to carry out the purposes of this title ”. At this point, it is important to note that the remainder of subdivision 8 of section 1005 (supra) contains the only prohibition or admonition contained in this section in that it sets forth the Authority shall at no time have power to pledge the credit of the State, nor lease or sell any (lam or powerhouse. No similar reservation of right is to be found elsewhere in the enumeration of the “ Powers and *895 duties of authority ”, excepting only the prior provision which forbids the trustees to waive or surrender any right of the State in and to the waters, channels, beds or uses of these rivers*
Moreover, the fact that the Authority was specifically given (§ 1007, supra) the right to acquire lands “ whether for immediate or future use ” and for purposes “ the authority shall find necessary or convenient ’ ’, and, upon such a finding, ‘ ‘ determine that such property is required for a public use ”, is language not without significance. And in announcing (§ 1012, supra) that the property of the Authority shall not be assessed or made subject to payment of taxes, there is included a further policy statement providing, in part: “ It is hereby found and declared that the projects authorized * * * are for the aid and improvement of commerce and" navigation and * * * such aid * * * and the development * * * of hydro-electric power is primarily for the benefit of the people * * * for the improvement of their health and welfare and material prosperity, and is a public purpose, and the authority shall be regarded as performing a governmental function in undertaking such projects ”.
Even though it is true the Authority has stated in its notice of appropriation that plaintiffs’ property is necessary for the improvement and development of the International Rapids section, the court, nevertheless, deems it within its power to determine whether or not the taking was, in fact, authorized, directly or impliedly, by statute. (Denihan Enterprises v. O’Dwyer, 302 N. Y. 451, supra; cf. United States ex rel. T. V. A. v. Welch, 327 U. S. 546.)
Although the Legislature did not see fit to indulge in details, yet within the broad scope of improvement and development of the International Rapids section in the interest of navigation, commerce and power, it did delegate to its agent the right to determine what real property was reasonably necessary, and, upon the making of such a finding, to condemn or acquire such land. By reference to the reports of its engineers and consultants, it can be seen the Authority considered this matter from a practical and technical viewpoint in arriving at its decision that plaintiffs’ lands were necessary. This court should not substitute its judgment and thus disturb such a finding in the absence of allegations disclosing, directly or by inference, that defendants acted in bad faith or so capriciously and arbitrarily as to be unreasonable. (United States v. Willis, 211 F. 2d 1, cert, denied 347 U. S. 1015. Also, cf. United States v. Eighty Acres of Land, 26 F. Supp. 315, 319.)
*896 It is, of course, possible that situations could arise where the taking would be so remote from the project, and so clearly unconnected therewith, as to justify a finding that statutory authority did not exist (see Feltz v. Central Nebraska Public Power & Irrigation Hist., 124 F. 2d 578, 582) but such does not seem to be the present case. It is clear all the properties here involved will, to some extent, be flooded and border on the newly created pool. From the complaints and the primary map, it appears that, with the rising of the level, the disputed lands of three of these plaintiffs will be entirely surrounded by water; a fourth (the Cuglars’ property), with the exception of the southerly one third on the mainland, will also become part of the same newly created island; and the fifth, which is downstream from the proposed Wilson Hill project, will become, when flooded, small parts of two other man-made islands, and partly mainland property. Thus, it can be seen the properties concerned in these actions are all physically connected with the project and so closely associated with it as to come within the statutory power of appropriation for development of navigation, commerce and hydroelectric plants. (Cf. United States v. Willis, supra.)
Nor is section 1007, of the act (supra), to the extent it authorizes the taking of property at the “ convenience ” of the Power Authority, unconstitutional in that it fails to provide a standard, or limitation upon the sovereign’s agent. Although this word must he read in connection with the general purposes for' which the Authority was formed and its stated functions and duties, it is also interesting to note the complaint nowhere alleges facts setting forth that convenience was the reason which motivated this appropriation. However, there is no doubt the Legislature can delegate its right to take property by eminent domain. (Pocantico Water Works Co. v. Bird, 130 N. Y. 249.) Neither is it necessary that the precise boundaries of the land to be acquired be determined by the Legislature itself, but it may in general terms delegate discretionary authority to its agency; and such delegation is not an abrogation of legislative duties or functions. (Matter of Townsend, 39 N. Y. 171, 174; cf. Kaskel v. Impellitteri, 306 N. Y. 73.)
Moreover, insofar as these complaints allege that the premises above the 246 elevation are “useless” and “unnecessary” for navigation, commerce or hydroelectric purposes, it must be held they are insufficient since the necessity for an appropriation of lands for public use is a legislative function, and the instrumentality in which it reposes such powers is the sole judge of the necessity, in lieu of any provision to the contrary. *897 (People v. Smith, 21 N. Y. 595, 598; Matter of Fowler, 53 N. Y. 60, 62; People v. Fisher, 190 N. Y. 468, 477; Matter of City of New York [Ely Ave.], 217 N. Y. 45, 57; Matter of Public Service Comm., 217 N. Y. 61; Matter of Hicks Development Corp. v. Incorporated Vil. of Lawrence, 282 App. Div. 1048, affd. 306 N. Y. 922; De Matteis v. Town of Hempstead, 207 Misc. 1026, affd. 286 App. Div. 1025, motion for leave to appeal denied 286 App. Div. 1104; Burda v. Palisades Interstate Park Comm., 204 Misc. 232, affd. 283 App. Div. 671; Matter of Schantz v. Genesee State Park Comm., 202 Misc. 682, 686.)
Despite the rather sweeping language used in some of the last-cited cases, it is likewise true an attempted appropriation could be so irrational or baseless, and with such utter disregard of the public necessity for its use, that the courts would interfere (cf. Kaskel v. Impellitteri, supra, p. 80; see, also, 18 Am. Jur., Eminent Domain, § 107). However, as stated in People v. Fisher (supra, p. 477) “ Private property cannot be taken for public use unless it is necessary for such public use, but all that is required of such officer or board in determining the necessity for taking private property is that they act in good faith and with sound discretion ”. And when such a finding or determination has been made, “ not corruptly or irrationally or baselessly, there is nothing for the courts to do about it ”. (See Kaskel v. Impellitteri, supra, p. 78.) Matter of Port of New York Auth. (118 N. Y. S. 2d 10) probably states the same rule, though in different language, thusly: “ The determination of the Commissioners of the Port Authority of the necessity of the particular property to be taken and the time of the taking are not to be set aside or interfered with unless it is palpably unreasonable. The Legislature has seen fit to delegate to them broad powers in that respect ”.
The facts here alleged do not show a palpable unreasonableness in the Power Authority’s decision that plaintiffs’ property was needed. Moreover, if unreasonableness must be demonstrated, to the extent of showing bad faith, this is likewise not apparent. Certainly bad faith, as such, is nowhere alleged in this complaint.
Hence, and in conclusion as to this issue of statutory authorization, the court determines that after examining the language of the “ Declaration of policy ”, as it refers to navigation, commerce and power, when read in the light of its historical background and significance, and when further considered in conjunction with the constant repetition of these objectives, and the consistent broad language and grant of powers specified in later sections of the act, it must be held the Authority *898 was authorized to appropriate plaintiffs’ lands, unless it can be said the complaint alleges adequate facts from which a court might later determine the taking was either excessive, or for uses private rather than public.
Excessive taking is alleged in paragraphs 13 through 16 of the Cuglar complaint. Plaintiffs set forth this excess in such terms as “ more than 80% ” in reference to parcel No. 724; “ the northerly one-third * * * and the southerly one-third of parcel 725 ”; and “ most of parcel 728 ”. In the first two instances, acreage can be determined by applying these percentages to the areas designated on the exhibit, but even this is not possible in reference'to the last parcel, “ most ” of which “ lies above the elevation of 246 feet ”. But what useful purpose would such figures serve? The court believes the same reasoning can be applied to these allegations of excessive taking, as was used in determining the Authority acted within its statutory powers.
It is a general principle that the taking of property in excess of that required for public use is unauthorized where such excess is to. be sold or devoted to a private use. - (City of Cincinnati v. Vester, 33 F. 2d 242, affd. 281 U. S. 439.) However, again in the absence of clearly unreasonable conduct, the courts will not substitute their judgment for that of the duly authorized agency. “ The legislative branch alone may determine the necessity and prescribe the method and extent of the taking.” (Matter of County of Nassau [Levittown], 207 Misc. 190, 192; Burda v. Palisades Interstate Park Comm., supra.)
The complaint further states (par. 29) that the attempted ‘ ‘ taking of the plaintiffs ’ real property in its entirety, without reference to elevation, topography, location, or other physical facts, is arbitrary, capricious and unreasonable ”. However, no facts are alleged to support this allegation. Unreasonableness on the part of the Authority in acquiring this land, such as would amount to bad faith, is not demonstrated; nor does the statute under which the appropriation was made provide any limitation on the quantity or extent of the land which may be taken. (Cf. Matter of Hicks Development Corp. v. Incorporated Vil. of Lawrence, supra.)
The court agrees citation of authority is hardly needed for the proposition that private lands may be taken, when authorized, only for a public use. But the question whether such uses are, in fact, public in character so as to justify the appropriation, is a judicial one to be determined by the courts. (Matter of Deansville Cemetery Assn., 66 N. Y. 569; Matter of Niagara Falls & Whirlpool Ry. Co., 108 N. Y. 375, 383; Pocantico Water *899 Works Co. v. Bird, 130 N. Y. 249, supra; Board of Black Riv. Regulating Dist. v. Ogsbury, 203 App. Div. 43, affd. 235 N. Y. 600; Denihan Enterprises v. O’Dwyer, supra; City of Cincinnati v. Vester, supra.)
If then the intended use or purpose is the focus of inquiry, it is important to recall what these complaints allege to be the private uses contemplated.
Insofar as the Stewart action is concerned (which refers to downstream property not connected with the Wilson Hill Development), the mere allegation, upon information and belief, that the Authority plans to sell or lease a substantial portion of the property not flooded to private persons for residential, recreational, business, commercial, and other reasons, is not sufficient to raise an issue of fact where it appears from the notice of appropriation attached to the complaint that the Authority deems her land necessary only for the improvement and development of the International Rapids section of the river. The court accepts as a fact that which is expressed in the act to be the legislative purpose, unless from the statute itself or from facts which may be judicially noticed, it is made to appear that the taking is not for such an expressed purpose. (Waterloo Woolen Mfg. Co. v. Shanahan, 128 N. Y. 345; Matter of Hicks Development Corp. v. Incorporated Vil. of Lawrence, supra; Matter of Public Service Comm., 217 N. Y. 61, 69, supra.) The Stewart complaint (which does not refer to the three brochures or the two resolutions) alleges insufficient facts to warrant a hearing as to whether the acquisition was for other than the development of the Saint Lawrence for navigation, commerce, and power purposes (De Matteis v. Town of Hempstead, supra), because facts are not set forth showing the property is to be unlawfully used, or that the taking is not for the purpose stated in the notice of appropriation.
The remaining four complaints differ in that they not only allege generally the Power Authority plans to lease the lands acquired from plaintiffs to private persons for permanent residences and campsites, but each specifically refer to statements in the brochures relating to the Wilson Hill Development, and say defendants have surveyed and staked out roads, lots, community parks and commercial areas on these properties.
Assuming these allegations are true, to the extent they disclose one of the purposes of defendants’ taking, and further assuming the brochures of the Authority and its two resolutions likewise disclose a probable future use of this property, the question then arising is whether, as a matter of law, the complaints state sufficient facts from which it could be determined, *900 after a hearing, that the taking was, in fact, private and not public. Without doubt, it is the affirmative of this contention upon which plaintiffs most strongly urge their rig’ht to a trial, although in this regard, it is difficult to see what additional proof they could muster in such an event.
In plaintiffs’ brief, counsel states their basic position to be that governmental agencies have the right to take only where the property so acquired is “ intimately connected with the public welfare ” and “ absolutely necessary for the gravest economic or sociological reasons ”. But authority does not exist for such a rule, so confined or restricted. The cases cited by plaintiffs, wherein the appropriation has been approved, cannot be so rationalized. The protective language, by way of dicta, with which the courts have sought to make their decisions clearly understood, represents the limit of the rule which does not include any concept of absolute necessity or intimate connection with the public good. Moreover, the decisions presented to substantiate plaintiffs’ contention, and wherein the appropriation has been struck down, seem clearly distinguishable on their facts (see Brewster v. Rogers Co., 169 N. Y. 73; Missouri Pacific Ry. v. Nebraska, 164 U. S. 403; Matter of Niagara Falls & Whirlpool Ry. Co., supra; Denihan Enterprises v. O’Dwyer, supra; but cf. Board of Black Riv. Regulating Dist. v. Ogsbury, supra; Matter of Deansville Cemetery Assn., supra). In fact the case of Little Falls Fibre Co. v. Ford S Son (127 Misc. 834, mod. 223 App. Div. 559, affd. 249 N. Y. 495, affd. 280 U. S. 369) does not touch the question of the State’s power of eminent domain, which, as Chief Judge Cardozo noted (p. 504), “ is a question not before us ”.
Plaintiffs also advance the proposition that a private appropriation occurs when land is acquired from one person for transfer to another, without anything more. But is this the situation here? In the first place, title to the property which has been appropriated will not be transferred to any private individual. Title will always remain with the State unless and until this whole project is later recaptured by the Federal Government (see art. 17 of license). While it is true plaintiffs will forever lose their, rights of possession and enjoyment, yet it does not follow such rights are permanently acquired by other private persons. In fact, if the Authority is permitted to lease sites for homes and cottages, it must be assumed these leases will be temporary in nature in the sense their terms will be for only 20 years, and in no event could extend beyond the 50-year life of the license itself. It may be urged, of course, this is a distinction without a difference, but at least any estate *901 in land less than fee ownership has usually been regarded as something different or less than a complete title.
While it is evident the act nowhere, in express terms, gives the Authority the right to acquire land and relocate buildings thereon, neither can there be found any language directly conferring a right to construct intake works for the water needs of a major industry (art. 22 of license), or to assist in underwriting the cost of a municipal sewage disposal plant (Dec., 1955 Brochure, p. 5), or to build “ fish protective devices ” (art. 26 of license). However, acts performed in carrying out a general power conferred by the Legislature, are not ultra vires where they are so closely related to the general powers as to be deemed incidental thereto, or within the contemplation of the Legislature when it granted the broad powers. (Bush Terminal Co. v. City of New York, 282 N. Y. 306.) As in the case of Felts v. Central Nebraska Public Power & Irrigation Dist. (124 F. 2d 578, supra) the statute here does not in terms authorize the taking of property for relocation purposes. Neither does it spell out in detail a power to acquire land on which to place 27 million yards of excavated material (see “ Engineers Report, Brochure, July, 1955, p. 2), although it is obvious such an incidental or implied right must exist if the works are to be completed.
Insofar as the complaints allege defendants have acquired this property for the purpose, among others, of relocating residences, necessary to be removed as the result of the flooding, this can be determined to constitute a taking for a public purpose. (Brown v. United States, 263 U. S. 78; Matter of Watkins v. Ughetta, 273 App. Div. 969, affd. 297 N. Y. 1002. See, also, Dohany v. Rogers, 281 U. S. 362; Rogers v. Bradshaw, 20 Johns. 735.)
It was held in Brown v. United States (supra) that the acquisition of land to relocate part of a town which was to be flooded, was so closely connected with the acquisition of the district to be flooded, and so necessary to the carrying out of the project, that the public use of the reservoir covered the taking of a new town site. In upholding the appropriation, the court deemed the taking to be within constitutional limits, and stated (p. 82) : “ The purchase of a site to which the buildings of a town can be moved and salvaged and the dispossessed owners be given lots in exchange for their old ones is a reasonable adaptation of proper means toward the end of the public use to which the reservoir is to be devoted. The transaction is not properly described as the condemnation of the land of one private owner to sell it to another.”
*902 In Matter of Watkins v. Ughetta (supra) 48 dwellings were required to be removed in the course of widening the Van Wyck Expressway in the borough of Queens. The city proposed to condemn land (of which petitioner’s property was a part) located some distance from the Expressway, and to relocate the 48 houses thereon. The petitioners sought an order in the nature of prohibition, partly on the assertion that the appropriation was not for a public use. The Appellate Division denied the application on the ground petitioners’ property was being taken for public use, citing Brown v. United States (supra). The Court of Appeals affirmed in a memorandum decision stating specifically there was no showing the taking was other than public in character.
So in this case, it appears that the reservoir to be created will result in flooding a large number of homes and cottages. The Authority has apparently recognized the hardship of compelling the owners to give up these homes and cottages with all the advantages a river site entails. It may be assumed defendant will offer to move these buildings to sites on the new shore line, which locations, however, the Authority must control because of their close connection with the project. The advantage of a location on this river is perhaps difficult to properly value, and is something which would be lost to these people unless they can be so relocated. The land to be acquired is thus so much a part of the project for power and navigation purposes as to be for a public use.
Furthermore, judicial examination of whether or not a proposed condemnation is for a public purpose is less critical where the State itself is to be vested with title (Denihan Enterprises v. O’Dwyer, supra; Matter of Long Sault Development Co. v. Kennedy, supra, pp. 407, 408) and a legislative declaration, though not conclusive, is entitled to great respect. (Cf. Block v. Hirsh, 256 U. S. 135, 154.)
Nor is the fact that the land taken will, under present plans, be leased constitute a private use. As was stated in Matter of New York City Housing Auth. v. Muller (270 N. Y. 333, 342): “ Use of a proposed structure, facility or service by everybody and anybody is one of the abandoned universal tests of a public use.”
But as a broader basis of decision, it is the court’s opinion plaintiffs’ lands were taken, primarily at least, for these engineering reasons: " The final category of land acquisition involves river frontage not required for construction purposes but needed because of raised water levels or for protection from flooding. Most of this property will be permanently *903 flooded * * *. The remainder is required to enable proper regulation of the river, pursuant to the criteria laid down by the International Joint Commission and the International Joint Board of Control and for manipulation of the pool to develop maximum firm power, maintenance of river control gauges, protection of river banks and otherwise for the control of the river as required by the license. It should be borne in mind that the final method of regulation of the River and Lake Ontario has not yet been officially promulgated and since some fluctuation of levels may result in the future because of subsequent changes in regulation methods, designs, of necessity, must cover all assumptions ” (Brochure, July, 1955, pp. 2, 3); and for the further purpose, “to prevent the Authority’s being beseiged by multitudinous claims based upon both foreseeable and unforeseeable complaints and undoubtedly including claims based upon erosion and the rise, fall and movement of the water ” (Brochure, July, 1955, p. 8); and for the additional reason stated in the “Consultant’s Report” (Brochure, Dec., 1955, p. 7), “ the Wilson Hill area will become an island when the water level of the River is raised and for this reason the Authority must own and control it for the protection of the project works
If this be correct, the primary purpose of taking plaintiffs’ lands was for use, and auxiliary use, in conjunction with the power aspects of this whole project; and this court, even if it were inclined to disagree, is surely in no position to dispute these findings from a construction or engineering point of view. (United States v. Willis, supra; United States v. Eighty Acres of Land, supra.) The fact that lands so required are to be put to an additional or supplemental use, which may entail limited enjoyment by private individuals, is no reason to say such a temporary use is without reasonable relation to the essential purposes for which this Authority was created. Such a limited relocation use, for the temporary benefit of a segment of the public which has been dispossessed by these works, together with the general right of enjoyment which all will share in the community parks and other areas of assembly on Wilson Hill, are surely something more than “ an incidental or colorable benefit to the public ”. (See and cf. Matter of New York City Housing Auth. v. Muller, 270 N. Y. 333, 343, supra.) That the public may be excluded, for a time, from those parts of this development leased to others, is a marginal result of an overall plan that falls far short of changing the essential purpose of the appropriation to a private use.
*904 In fact, it is probably well to again note that the Authority’s grant of powers (§ 1005, supra) specifically and in plain language gives the trustees the right to accept a Federal license containing such terms and conditions as they, in their sole discretion, deem reasonable, and that one of the provisions of this license (art. 7) directs the Authority (for public access, recreation, hunting and fishing) to “ allow for such purposes the construction of access roads, wharves, landings, and other facilities on its lands, the occupancy of which may in appropriate circumstances be subject to payment of rent to the licensee ”. It seems reasonable to say therefore, that if the primary purpose of this taking is public in nature, as the court believes, the Authority also has sufficient authorization to use plaintiffs’ lands for the incidental or temporary purposes to which they are to be put. (Cf. Brown v. United States, supra.)
Indeed, the court might also observe that so providing for temporary housing facilities has, in itself, some reasonable relation to commerce “ in, through, along and past ” (§ 1005, subd. 5) the International Rapids section; and so anticipating a public need, which may fairly be foreseen, has been sanctioned as a factor that may be considered. (See and cf. Rindge Co. v. Los Angeles, 262 U. S. 700, 707.) Surely any plan or project which purports to save homes and summer residences is agreeable to section 178-e of the State Finance Law which recognizes a housing shortage and declares, in part, “ that this condition requires that provisions be made for the relocation and rehabilitation of dwellings affected by state projects
Lastly, there is one Federal decision upon which plaintiffs, without doubt, most strongly rely. Indeed, it is fair to assume the complaint was fashioned, in part, on the lower court’s decision in United States v. 209.25 Acres of Land (108 F. Supp. 454). Although counsel has frequently cited this opinion, it may be inferred it was not realized the Court of Appeals subsequently reversed, and that certiorari was later denied. (United States v. Willis, 211 F. 2d 1,. cert, denied 347 U. S. 1015, supra.)
On the facts, it must be admitted the Willis case is strikingly similar. There the Federal Grovernment was appropriating lands on the White River in Arkansas and Missouri for construction of the Bull Shoals Dam and Reservoir. Lands were acquired pursuant to congressional authorization which provided, in essence, that “ the Secretary of War [now Secretary of the Army] is hereby authorized and directed to acquire in the name of the United States title to all lands, easements, and rights-of-way necessary for any dam and reservoir project * * * for flood control”. The opinion in the lower court *905 further states (pp. 455-456) that “All of the land which the government is taking from the defendant is above the 700 foot contour line with the possible exception of three tracts of not more than one-quarter of an acre each ’ ’; that ‘ ‘ The 654 contour line marks the permanent operating level of the water in the reservoir. The water will not reach the 700 foot contour line except in times of flood ”; and that “ testimony does not show the exact distance from the boundaries of defendant’s land to the 700 foot contour line, but the distance between that contour line and the boundaries of defendant’s tracts is considerable ”.
From the opinion in the District Court it will also be observed the lands of the property owner Willis were to be possibly utilized for a project known as the “ Blue Hole Home and Club Sites ”. As in the situation now before this court, the development area was to be divided into lots for leasing to private individuals or private clubs, and for the construction of summer homes; access roads and utilities were to be installed and the leases were projected on a 25-year basis.
Applying these facts in their relation to the Federal statute, the lower court struck down the appropriation, in this language (p. 462): “ The testimony does not disclose any fact showing that the defendant’s land will be used for the purposes set forth in the statute under which the Secretary of the Army proceeded to condemn and take the land. But, the testimony abundantly establishes that the land may be useful to the government in the future for other purposes; that is, such purposes as some planner of the course of the lives of the citizens may have in mind. The action of the government in this case, if sustained, will result in depriving the defendant of his property * * * for a non-public use, contrary to the authority vested in the Secretary of the Army when the Congress directed and authorized him ' to acquire in the name of the United States title to all lands, easements, and rights-of-way necessary for any dam and reservoir project * * * for flood control’.”
As previously noted the Court of Appeals “reversed and remanded ’ ’, and probably indicated it would have granted the same relief on a motion properly addressed to the pleadings.
In referring to the issue before the District Court, the appellate court stated (211 F. 2d 1-2): “ The question which the court purported to resolve, as a basis for its action, was, * * * ‘ whether the Secretary of the Army and the Corps of Engineers acted in bad faith or so capriciously and arbitrarily in taking the defendant’s land that their action was without adequate determining principle or was unreasoned. ’ * * * The *906 court thus undertook to review the administrative determination of necessity and quantity which had been made, within the qualification of bad faith or arbitrariness and capriciousness, which has sometimes been said — mostly by way of dictum— to warrant judicial overthrow of administrative judgment as to condemnation taking, in relation to the legislative authority granted, and which the Supreme Court itself apparently left open in United States v. Carmack, 329 U. S. 230 ’ ’.
In commenting on the evidence, the opinion goes on (p. .3) to note the real estate division chief, of the Corps of Engineers, had testified in substance, that the Blue Hole Home and Club Sites plan was a project study, and that this possible utilization was not the purpose for which the disputed lands had been acquired; rather, “ that it had been determined that its inclusion was necessary for the proper operation and maintenance of the reservoir; and that this was the basis on which the condemnation had been made. He further stated, ‘ The area around the water line is acquired for the operation and maintenance of the project.’ ”
In reaching its decision the upper court used this significant language (pp. 3-4): “ Whatever might be the validity otherwise— which we need not decide — of the considerations on which the court relied, as indicating that the administrative determination had been without adequate determining principle and had been unreasoned, these factors could not in any event be allowed to control the question of arbitrariness and capriciousness, without also taking into account the reality, to which we have referred, that the 80.9-acre tract extended as a comparatively narrow peninsula, 1900 feet in length, into the heart of the reservoir; * * * In any event, it seems to us that it would not be legally possible to call the judgment of the Engineering Corps arbitrary and capricious, in having determined that it was expedient, as a matter of sound relationship to the practical operation and maintenance of the reservoir, for the Government to acquire as part of the project, and so have control of, the relatively small 80.9-acre tract, which extended as a narrow peninsula into the heart of the reservoir; which would be surrounded by the water of the reservoir on three of its four sides; which was the subject of only slight economic use (18 to 20 acres in actual cultivation) ■ which had only a small economic value (it was stipulated that just compensation for the land would be $1800); and which had been purchased by defendant, after the plans for the project had been revealed, obviously as a site for private resort homes to be built within the reservoir area.”
*907 While the Willis decision discloses some factual differences, yet it is closely analogous for the reason the Cuglar property left on the new shore line will likewise be a peninsula jutting into the power pool, and their remainder property surrounded by water on all sides; that while the Cuglars may not have engaged in speculation, nevertheless, the records in the St. Lawrence County Clerk’s office disclose they acquired these lands by deed dated April 27, 1953 and recorded on the 22nd day of the following month. The Federal license was issued July 15, 1953.
Apart from these facts however, it can be said that the engineering findings, upon which the Circuit Court of Appeals rested its decision, were deemed sufficient to sustain an appropriation based upon a Federal statute which does not appear to be as broad in its scope or grant of powers as the provisions of the Public Authorities Law now before this court. Moreover, the engineering findings, here observed from the brochures, are even more detailed and explicit.
The court therefore determines the appropriations herein examined were for uses public and not private; that hence no justiciable issues exist (see dissenting opinion of Desmond, J., Denihan Enterprises v. O’Dwyer, 302 N. Y. 451, supra).
Insofar as these complaints raise any constitutional questions, they are insufficinet. The only limitation upon the exercise of the power of eminent domain is that the use must be public, compensation must be made, and due process observed. (Matter of Fowler, 53 N. Y. 60, supra.) Subject to these constitutional limitations, the State may take property at will. (People v. Adirondack Ry. Co., 160 N. Y. 225, affd. 176 U. S. 335.)
The court therefore concludes there are no justiciable issues raised by the complaints in these five actions, and accordingly, defendants’ motion to dismiss is, in each instance, granted, without costs.
Orders may be submitted.