Brinkmann v. Town of Southold, New York

IN THE

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

August Term, 2022
Argued: May 3, 2023
Decided: March 13, 2024

No. 22-2722
_____

BEN BRINKMANN, HANK BRINKMANN, MATTITUCK 12500 LLC.,

Plaintiffs-Appellants,

v.

TOWN OF SOUTHOLD, NEW YORK,

Defendant-Appellee.

_____

Before: KEARSE, JACOBS, and MENASHI, Circuit Judges.

Plaintiffs appeal from the judgment of the United States District Court for the Eastern District of New York (DeArcy Hall, J.), which dismissed their complaint alleging that the taking of their land for a public park was a pretextual and bad faith exercise of the Takings Clause of the Fifth Amendment and therefore unconstitutional, because the real motive was to prevent construction

of the Plaintiffs' hardware store.

For the reasons below, we **AFFIRM.** Judge Menashi dissents in a separate opinion.

JEFFREY REDFERN (William Aronin, Institute for Justice, Arlington, VA; Arif Panju, Christen Mason Hebert, Institute for Justice, Austin, TX, <u>on the brief</u>), <u>for Plaintiffs-Appellants</u>.

BRIANNA WALSH (James M. Catterson, Danielle Stefanucci, Pillsbury Winthrop Shaw Pittman LLP, New York, NY, <u>on the brief</u>), <u>for Defendant-Appellee</u>.

DENNIS JACOBS, <u>Circuit Judge</u>:

The Defendant Town of Southold ("Southold" or the "Town") authorized the creation of a park on a parcel to be taken by eminent domain from Ben and Hank Brinkmann, who planned to build there a big-box hardware store with an 80-car parking lot. The complaint alleges facts sufficient to support a finding that the decision to create the park was a pretext for defeating the Brinkmanns' commercial use, and was made after varied objections and regulatory hurdles that the Town interposed and that the Brinkmanns did or could surmount.

The Brinkmanns and their company Mattituck 12500 LLC (collectively, "Plaintiffs") appeal from a judgment of the United States District Court for the

2

Eastern District of New York (DeArcy Hall, J.) dismissing the complaint under Fed. R. Civ. P. 12(b)(6). The only question is whether the Takings Clause is violated when a property is taken for a public amenity as a pretext for defeating the owner's plans for another use.

On appeal, Plaintiffs argue that the exercise of eminent domain violates the Takings Clause if that public use, though real, is pretextual. We conclude that when the taking is for a public purpose, courts do not inquire into alleged pretexts and motives. Since a park is a public amenity that serves a public purpose, we affirm.

**I**

Ben and Hank Brinkmann own a chain of hardware stores on Long Island. In 2016, they contracted to buy (through plaintiff Mattituck 12500 LLC) a parcel of land on which to expand that chain in a commercial hub of Southold, New York. In response to objections by some residents "about the impact that the proposed store would have on traffic at the intersection," J.A. at 77 (Compl. ¶ 39), the Brinkmanns funded a traffic study which found that the store would not cause traffic problems, and agreed to pay for improvements to the intersection that the Town deemed necessary. The Town next demanded that

3

the Brinkmanns fund a "Market and Municipal Impact Study," and apply for special permits.   When the Brinkmanns undertook to comply, Southold unsuccessfully attempted to purchase the site before the Plaintiffs closed.

After closing, Southold imposed a six-month moratorium on building permits in a one-mile area centered on Plaintiffs' property and twice extended the moratorium despite the county government's finding that the moratorium lacked supportive evidence.   In July 2020, Southold convened a public hearing to consider whether a park on the parcel would constitute a public use.   Formal findings to that effect were made in September 2020, and acquisition was authorized for a "passive use park."

Plaintiffs brought a § 1983 challenge alleging a pretextual taking in violation of the Takings Clause of the Fifth Amendment.   The district court denied the Plaintiffs' motion for a preliminary injunction and granted Southold's motion to dismiss.

Plaintiffs now appeal.

## II

We review <u>de novo</u> a district court's grant of a motion to dismiss, "constru[ing] the complaint liberally, accepting all factual allegations in the

4

complaint as true, and drawing all reasonable inferences in the plaintiff's favor."

Palin v. New York Times Co., 940 F.3d 804, 809 (2d Cir. 2019) (quoting Elias v. Rolling Stone LLC, 872 F.3d 97, 104 (2d Cir. 2017)).

**III**

The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST., amend. V. There are only "two limitations on the sovereign's right to exercise eminent domain: the property taken must be for public use, and the owner must receive just compensation." Brody v. Vill. of Port Chester, 434 F.3d 121, 127 (2d Cir. 2005). The Plaintiffs, without contesting that a public park is a public use, allege that Southold is using the park as a cover for its true motive, which is to thwart the Brinkmanns' plan for a hardware store. According to Plaintiffs, under Kelo v. City of New London, 545 U.S. 469 (2005), "the Public Use Clause requires the government's stated objective to be genuine, and not a pretext for some other, illegitimate purpose." Appellants' Br. at 19.

But Kelo cannot support that reading; the Takings Clause is not an overarching prohibition against any and all purposes alleged to be "illegitimate." As we have previously observed, the Kelo opinion includes only "a passing

5

reference to 'pretext' . . . in a single sentence." Goldstein v. Pataki, 516 F.3d 50, 61 (2d Cir. 2008). And the context of that sentence is a passage of Kelo describing the Takings Clause's parameters and its prohibition of takings for "private" purposes:

> Two polar propositions are perfectly clear. On the one hand, it has long been accepted that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation. On the other hand, it is equally clear that a [government] may transfer property from one private party to another if future "use by the public" is the purpose of the taking . . . .
>
> As for the first proposition, the [government] would no doubt be forbidden from taking petitioners' land for the purpose of conferring a private benefit on a particular private party. See [Hawaii Hous. Auth. v.] Midkiff, 467 U.S. [229,] 245 [(1984)] ("[a] purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void") . . . . Nor would the [government] be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit.

Kelo, 545 U.S. at 477–78 (internal citation and footnote omitted).

"Subject to specific constitutional limitations, when the legislature has" decided that something is a public use, "the public interest has been declared in

6

terms well-nigh conclusive." Berman v. Parker, 348 U.S. 26, 32 (1954).

Accordingly:

> In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be Congress legislating concerning the District of Columbia . . . or the States legislating concerning local affairs. . . . This principle admits of no exception merely because the power of eminent domain is involved. . . ."

Midkiff, 467 U.S. at 239–40 (quoting Berman, 348 U.S. at 32). Midkiff goes on to say:

> There is, of course, a role for courts to play in reviewing a legislature's judgment of what constitutes a public use . . . . But the Court in Berman made clear that it is "an extremely narrow" one. [348 U.S.] at 32. The Court in Berman cited with approval the Court's decision in Old Dominion Co. v. United States, 269 U.S. 55, 66 (1925), which held that deference to the legislature's "public use" determination is required "until it is shown to involve an impossibility." . . . . [T]he Court has made clear that it will not substitute its judgment for a legislature's judgment as to what constitutes a public use "unless the use be palpably without reasonable foundation." United States v. Gettysburg Electric R. Co., 160 U.S. 668, 680 (1896).
>
> . . . . [W]here the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause.

7

Midkiff, 467 U.S. at 240–41.

There can be no dispute that a public park, even an unimproved one, is a public use.  Public parks have been recognized as a "public use" for more than a century.  See, e.g., Shoemaker v. United States, 147 U.S. 282, 297, 13 S. Ct. 361, 390 (1893) ("The validity of the legislative acts erecting [public] parks, and providing for their cost, has been uniformly upheld."); Rindge Co. v. Los Angeles Cnty., 262 U.S. 700, 707–08 (1923) ("condemnation of lands for public parks is now universally recognized as a taking for public use").

While in some cases there may be plausible allegations that the exercise of eminent domain supposedly for a park had been pretext for an intention to use taken property for a different--and private--purpose, Plaintiffs' complaint does not allege that the Town meant to confer any such private benefit or intends to use the property for anything other than a public park.  To the contrary, the complaint quotes the Town's Supervisor as stating, "I will never allow anything to be built on that property."  J.A. at 24 (Compl. ¶ 75).  Plaintiffs have not pointed to any Town purpose that violates the Takings Clause.

This Court's holding in Goldstein confirms that understanding. Goldstein involved a post-Kelo challenge to takings made to build a basketball stadium and several high-rise apartment buildings in Downtown Brooklyn. Goldstein, 516 F.3d at 53. Plaintiffs' contention was "that the project's public benefits are serving as a 'pretext' that masks its actual raison d'être: enriching the private individual who proposed it and stands to profit most from its completion," id. at 52–53--and that "all of the 'public uses' the defendants have advanced for the Project are pretexts for a private taking that violates the Fifth Amendment," id. at 54. Rejecting that argument, this Court held 1) that the resulting economic development of Brooklyn was a public benefit, and 2) that "review of a legislature's public-use determination is limited such that where the exercise of the eminent domain power is rationally related to a conceivable public purpose, . . . the compensated taking of private property . . . is not proscribed by the Constitution." Id. at 58–59 (internal quotation marks omitted).

As Goldstein demonstrated, a pretext-based challenge to a taking has a "dubious jurisprudential pedigree." Goldstein, 516 F.3d at 62. Assessing the same lone sentence from Kelo on which the Brinkmanns attempt to build their hardware store, this Court "reject[ed] the notion that in a single sentence, the

9

Kelo majority sought *sub silentio* to overrule Berman, Midkiff, and over a century of precedent[.]"   Id.   "We do not read Kelo's reference to 'pretext' as demanding, as the appellants would apparently have it, a full judicial inquiry into the subjective motivation of every official who supported the Project, an exercise as fraught with conceptual and practical difficulties as with state-sovereignty and separation-of-power concerns."   Id. at 63.

Thus it is demonstrated that judicial deference is justified by federalism, Kelo, 545 U.S. at 482 ("Our earliest cases [on the Public Use Clause] in particular embodied a strong theme of federalism[.]"); by separation of powers, Berman, 348 U.S. at 32 ("[T]he legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation[.]"); by competence, Midkiff, 467 U.S. at 244 ("[L]egislatures are better able to assess what public purposes should be advanced by an exercise of the taking power."); and by prudence, Kelo, 545 U.S. at 499 (O'Connor, J., dissenting) (it would be "unworkable" for courts to "decid[e] . . . what is and is not a governmental function" (quoting Midkiff, 467 U.S. at 240–41)).

A "pretext" limitation that invalidates a taking for a public park would undo this "longstanding policy of deference to legislative judgments in this

field," id. at 478, 480, by inviting courts "in all cases to give close scrutiny to the mechanics of a taking rationally related to a classic public use as a means to gauge the purity of the motives of the various government officials who approved it," Goldstein, 516 F.3d at 62.  Such motives are by nature fragmented--and rarely, if ever, pure.  Different legislators may vote for a single measure with different goals.  See, e.g., Edwards v. Aguillard, 482 U.S. 578, 636–37 (1987) (Scalia, J., dissenting) ("[W]hile it is possible to discern the objective 'purpose' of a statute . . . discerning the subjective motivation of [a legislative body] is, to be honest, almost always an impossible task.  The number of possible motivations, to begin with, is not binary, or indeed even finite.").  So members of a town council who are hostile or indifferent to a hardware store or other commercial use may vote for a park (in whole or part) because they favor open space (there or elsewhere) for reasons of aesthetics, and for playgrounds, athletics, fresh air, dog-runs, and whatnot.

In this area, Supreme Court precedent wisely forecloses inquiry into whether a government actor had bad reasons for doing good things.  A condemning authority, therefore, has "a complete defense to a public-use challenge" if, "viewed objectively, the Project bears at least a rational relationship

11

to . . . well-established categories of public uses, among them . . . the creation of a public, open space[.]"  Goldstein, 516 F.3d at 58–59.

**IV**

Plaintiffs point to a series of state and federal court decisions which purportedly endorse a generalized "pretext" limitation on the Takings power. They are undaunted by the fact that this limitation has never presented itself as the dispositive issue in either this Circuit or before the Supreme Court.  The cases which supposedly suggest otherwise are uniformly inapposite: they are nearly all decided on the principle that has been articulated in some state courts-- but is unknown to federal takings law--that instrumentalities of the states lack the power to act (variously) "in bad faith," or "arbitrarily and capriciously."

For example, in United States, Department of Interior v. 16.03 Acres of Land, More or Less, Located in Rutland County, Vermont, 26 F.3d 349 (2d Cir. 1994) ("Rutland County"), while we began by noting that "condemnation decisions by governmental entities to which Congress has delegated eminent domain authority are subject to judicial review," we explained that an inquiry at the outset is needed as to whether officials authorized to effect a taking for a public purpose have "acted outside the scope of their taking authority," id. at

12

355. Rather than suggesting that there is a generalized pretext limitation on takings, we emphasized that "a reviewing court may only set aside a takings decision as being arbitrary, capricious, or undertaken in bad faith in those instances where the court finds the [official's] conduct so egregious that *the taking at issue can serve no public use*." Id. at 356 (emphasis added). We thus applied the principle enunciated in <u>Berman</u> that the narrow role of the judiciary in a Takings Clause case is to determine whether the purpose was a "public use."

Plaintiffs also rely on a New Jersey rule that forbids takings "motivated by fraud, bad faith, or other manifest abuse of [a municipality's] accorded power of eminent domain." <u>E. Windsor Mun. Utilities Auth. v. Shapiro</u>, 270 A.2d 410, 411 (N.J. 1970). But that rule is actually derived from a state law doctrine which provides that "[s]o long as [a municipal] corporation operates within the orbit of its statutory authority, it is well established that the courts will not interfere with the manner in which it exercises its power in the absence of bad faith, fraud, corruption, manifest oppression or palpable abuse of discretion[.]" <u>City of Newark v. New Jersey Tpk. Auth.</u>, 81 A.2d 705, 707 (N.J. 1951). In other words, the kind of bad faith taking discussed in the New Jersey cases relied upon by the Plaintiffs are *void ab initio* acts that are beyond the municipality's statutory

13

authority. Those cases do not concern the Fifth Amendment's Takings Clause.

For example, in <u>Borough of Essex Fells v. Kessler Institute for Rehabilitation, Inc.</u>,

673 A.2d 856 (N.J. Super. Ct. Law Div. 1995), the court included a citation to that

clause of the federal Constitution along with its citation to the New Jersey

Constitution, <u>see id.</u> at 860; but it cited no federal cases, and it referred only to

having researched New Jersey and other state law cases, <u>see id.</u> at 861. As the

court found, there were as of 1995 "no reported New Jersey decisions upholding

a bad faith challenge to a public body's authority to condemn[.]" <u>Id.</u>

Further, the decision in <u>Essex Fells</u> did not represent application of a

generalized prohibition of pretext. Rather, the court concluded that the plaintiff

Borough had failed to show that its taking was for a public use. Although the

Borough stated, in accordance with New Jersey's Eminent Domain Law, that

"this property is needed for public use[,] specifically park land and recreational

use," <u>id.</u> at 860 (internal quotation marks omitted), the court found that the

Borough in fact "had *not* determined that it should proceed to condemn Kessler's

land *for any authorized public purpose*," <u>id.</u> at 862 (emphasis added). There was

ample basis in the record for this finding, including evidence that when the

property had been part of an approximately 15-acre parcel owned by a college

14

and offered to the Borough, the Borough had opted to purchase only 2.53 acres, "stat[ing] that the [B]orough's need for any additional recreational space was [thereby] fully met"; that the Borough believed that it would "have some control over who purchased the balance of the subject property"; that the Borough had a "gentlemen's agreement" with the college to "sell the balance of the property 'to the right people'"; and that the "Borough officials were actively soliciting residential developers to acquire" "the balance of the property" "for development of single family residences"; according to the mayor, the Borough "had never wanted anything but single family housing at this site." Id. at 858, 861–62 (internal quotation marks omitted). This is the polar opposite of the acknowledgement in the Plaintiffs' complaint that Southold's Town Supervisor said he would "never allow anything to be built on th[e subject] property." J.A. at 24 (Compl. ¶ 75).

Rhode Island and Georgia likewise derive their prohibition on "bad faith"

takings from similar doctrines of state law.   (These cases are disposed of in the

margin.[1])

---

[1] **Rhode Island:** <u>Rhode Island Economic Development Corp. v. The Parking Co., L.P.</u>, 892 A.2d 87 (R.I. 2006), speaks to whether a state "agency has exceeded its delegated authority by an arbitrary, capricious, or bad faith taking of private property," <u>id.</u> at 103 (internal quotation marks omitted) (citing <u>Capital Properties, Inc. v. State</u>, 749 A.2d 1069, 1086 (R.I. 1999) ("[A] showing that a [state] agency has exceeded its delegated authority by an arbitrary, capricious or bad faith taking of private property is a matter properly cognizable by the judicial branch.")).   True, the court goes on to say that "substantive due process" is in play "even when the [taking] is made through procedures that are in themselves constitutionally adequate.'"   <u>Id.</u> at 104 (quoting <u>Brunelle v. Town of South Kingstown</u>, 700 A.2d 1075, 1084 (R.I. 1997)).   But the case it cites for that proposition, <u>Brunelle</u>, itself relies on a hodgepodge of federal case law, most notably a Ninth Circuit case, <u>Sinaloa Lake Owners Ass'n v. City of Simi Valley</u>, 882 F.2d 1398 (9th Cir. 1989), which took an exceedingly broad view of substantive due process generally, holding that it prohibits "arbitrary and capricious government action" in *any* context, <u>id.</u> at 1407, but which had been overruled by <u>Armendariz v. Penman</u>, 75 F.3d 1311, 1325-26 (9th Cir. 1996) (en banc)--a case that itself was later "undermined" in part, <u>Crown Point Development, Inc. v. City of Sun Valley</u>, 506 F.3d 851, 852–53 (9th Cir. 2007), by Supreme Court decisions, <u>see id.</u> at 854–56.   <u>See also</u> <u>Shannon v. Jones</u>, 812 F. App'x 501, 503 (9th Cir. 2020) (describing <u>Armendariz</u> as "overruled in part . . . as recognized in <u>Crown Point Dev[elopement]</u>").   All this is to say that the Rhode Island case law is muddled both by state law on state agencies' authority to use the eminent domain power and by a reliance on vague and overbroad out-of-circuit authorities on substantive due process.

Other state cases relied on by the Plaintiffs invoke a rule against pretext without distinguishing between the Takings Clause of the Fifth Amendment and the state statutory analog. This conflation invites the misreading of the federal Takings Clause. For example, Plaintiffs cite Middletown Township v. Lands of Stone, 939 A.2d 331 (Pa. 2007), which offers dicta on the federal Takings Clause, but ultimately rests its decision on the far narrower ground that the township at issue was "authorized by statute to exercise eminent domain only for a single

---

**Georgia:** Earth Management, Inc. v. Heard County, 283 S.E.2d 455 (Ga. 1981), invokes a bar on "bad faith" exercises of the eminent domain power in the context of municipalities' statutory inability to take *any* action in bad faith. Earth Management cites "[t]he most recent pronouncement of this court on the issue of bad faith," id. at 460, in City of Atlanta v. First National Bank of Atlanta, 271 S.E.2d 821 (Ga. 1980), a case which itself bases its holding on the premise that "[a] court should not interfere with an exercise of the discretion of a condemning authority determining the necessity of taking land for public purposes and selecting the location and amount of land reasonably necessary unless the condemning authority abused its discretion or exceeded its authority," id. at 822. For that proposition, City of Atlanta relies on authority from a 1908 holding that actions undertaken by municipal corporations "should not be interfered with or controlled by the courts, unless made in bad faith, or capriciously or wantonly injurious, or in some respect beyond the privilege conferred by statute or its charter." Piedmont Cotton Mills v. Georgia, Ry. & Elec. Co., 62 S.E. 52, 54 (Ga. 1908). The second Georgia case cited by Plaintiffs, Carroll County v. City of Bremen, 347 S.E.2d 598 (Ga. 1986), merely follows on from Earth Management. Under these cases, any issue as to bad faith was simply part of the inquiry into whether the taking was within the scope of statutory authority.

17

public purpose, that of recreation." Id. at 337. Thus, the court was obviously empowered to search the "true" purpose of the alleged taking because "[r]ecreational use must be the true purpose behind the taking or else the Township simply did not have the authority to act, and the taking was void ab initio." Id. at 337–38. Plaintiffs' cited Colorado case, City of Lafayette v. Town of Erie Urban Renewal Authority, 434 P.3d 746 (Colo. App. 2018), also has nothing to do with the Takings Clause: it interprets a Colorado statute granting the power of eminent domain to a condemning authority. That statute requires "the condemning entity to demonstrate, by a preponderance of the evidence, that the taking of private property is for a public use." Id. at 751 (quoting COLO. REV. STAT. ANN. § 38-1-101(2)(b)). At the risk of being obvious, where state takings are subject to statutes that prescribe uses and evidentiary standards, the courts have a role to play. But the scope of power to review comes from the standards set in the relevant statutes, not from the Takings Clause.

Finally, Plaintiffs rely on a single New York State trial court decision that was never appealed. In In re Hewlett Bay Park, 265 N.Y.S.2d 1006 (N.Y. Sup. Ct. 1966), the court rejected a pretextual taking and held that "when dealing with a legislative determination to condemn, it becomes especially important to

18

scrutinize the purpose, for a proper purpose is the very essence of the right to condemn," id. at 1010. However, Hewlett Bay Park relied for that holding in part on Cuglar v. Power Authority of the State of New York, 163 N.Y.S.2d 902 (N.Y. Sup. Ct. 1957), which recognized the well-established principle that "appropriation of lands for public use is a legislative function, and the instrumentality in which it reposes such powers is the sole judge of the necessity, in lieu of any provision to the contrary,"[2] id. at 921.

While federal courts--in dicta--have occasionally stated as a broad principle that takings will be upheld "in the absence of bad faith," see, e.g., United States v. 58.16 Acres of Land, More or Less In Clinton Cnty., State of Ill., 478 F.2d 1055, 1058 (7th Cir. 1973) (quoting United States v. Meyer, 113 F.2d 387,

---

[2] Though the court in Cuglar acknowledges a single precedent to the contrary--Application of Port of New York Authority, 118 N.Y.S.2d 10 (N.Y. Sup. Ct. 1952)--application of that decision--like the majority of the state court cases Plaintiffs rely on--is based on state *statutory* grants of eminent domain powers to condemning authorities (in this case, the Port Authority) which in turn place limits on the condemning authority's ability to undertake "palpably unreasonable" condemnations, id. at 10–11 (citing, inter alia, Section 15, chapter 47, Laws of 1931, McK. Unconsol. Laws, § 6485, Bridge and Tunnel Unification Act).

392 (7th Cir. 1940)), no such "bad faith" rule has ever proved dispositive.[3]   For

example, the Seventh Circuit in 58.16 Acres of Land noted that it had "cited

[cases] which hold that the courts are empowered to determine if the taking of

private property is for a public use," and it issued a narrow ruling that, because

"questions of bad faith, arbitrariness, and capriciousness, *all bearing upon the*

*determination of public use*, ha[d] been raised by [landowners], the district court

was required to resolve those questions," id. at 1059 (emphasis added).   It did

not announce a "bad faith" or "pretext" limitation on the power of eminent

domain.   Neither did the Ninth Circuit's decision in Southern Pacific Land Co.

v. United States, 367 F.2d 161 (9th Cir. 1966), which merely stated in dicta that

"the Supreme Court itself has declined to rule out the possibility of judicial

review where the administrative decision to condemn a particular property or

property interest is alleged to be arbitrary, capricious, or in bad faith," id. at 162

---

[3] The allusion to such a "bad faith" limitation appears to be purely aspirational.
Most such references derive from Shoemaker.   There, the Supreme Court cited
approvingly to an older case which noted in dicta that "[i]t is to be assumed that
the United States is *incapable of bad faith*" and that "the citizen may well confide in
the ultimate justice of his government[]--the most generous, as it is the happiest
and most powerful, on the earth."   Shoemaker, 13 S. Ct.at 375 (emphasis added)
(quoting Great Falls Manuf'g Co. v. Attorney General, 124 U.S. 581, 599 (1888)).

(discussing <u>United States v. Carmack</u>, 329 U.S. 230, 243–44 (1946)).   That may have been so in 1966, but it is not so now.   The Supreme Court's current pronouncement on "pretext" concerns *only* the pretext of non-public (that is, private) use.   <u>Kelo</u>, 545 U.S. at 478.   So long as the actual purpose for which the eminent domain power is exercised is a public one, there is no violation of the Takings Clause.

Of course, courts may intercede if an exercise of eminent domain runs afoul of some *other* constitutional or statutory provision which *does* permit an examination of motives, such as Title VII of the Civil Rights Act or the Equal Protection Clause.   States--as well as Congress--are also free to place additional limitations on the power of their instrumentalities to exercise the power of eminent domain.   And they may invite the courts to help police those limitations.   But the Takings Clause itself includes no such limitations.

We have considered Plaintiffs' remaining arguments and find them to be unavailing.

\*     \*     \*

21

The dissent endeavors to avoid or cloud our holding that a taking is permitted by the Takings Clause if the taking is for a public purpose--as a public park indisputably is. In so doing, the dissent commits two errors.

First, the dissent repeatedly conflates [i] the *purpose* for which the property was taken and is to be used--a public park--with [ii] the *motivation* for taking it. See, e.g., Dissent at 2 (" . . . preventing an owner from lawfully using his own property is not a valid public purpose."). Thus the dissent treats the Takings Clause as an overarching prohibition against ulterior motives. See id. at 26. Such a doctrine would allow litigation to long delay and ultimately stifle the making of public infrastructure.

The dissent relies on an entirely off-point case, concerning the ripeness and validity (or not) of a *regulatory* taking claim, in which no compensation is paid. Sherman v. Town of Chester, 752 F.3d 554, 561–65 (2d Cir. 2014); see Dissent at 5. It, therefore, mattered a lot whether the town had "suffocat[ed] [plaintiff] with red tape to make sure he could never succeed in developing" his property without the town ever exercising the eminent domain power or paying just compensation. Sherman, 752 F.3d at 565. At the risk of being obvious,

different factors may come into play if a taking is attempted without compensation. So, nothing in <u>Sherman</u> undermines the well-settled proposition that "where the *exercise of the eminent domain* power is rationally related to a conceivable public purpose," as it undeniably was in this case, "the Court has never held a *compensated* taking to be proscribed by the Public Use Clause." <u>Midkiff</u>, 467 U.S. at 241 (emphases added). The "longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' *and vice versa*." <u>Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency</u>, 535 U.S. 302, 323 (2002) (emphasis added) (footnote omitted).

As our opinion observes, other statutory and constitutional provisions *do* allow courts to examine allegedly invidious or discriminatory motivation. Op. at 21; <u>Berman</u>, 348 U.S. at 32 ("*Subject to specific constitutional limitations*, when the legislature has" decided that something is a public use, "the public interest has been declared in terms well-nigh conclusive." (emphasis added) (quoted in Op.

23

at 6–7)).   Nothing in this opinion inhibits the enforcement of laws that prohibit invidious discrimination based on race or religion, or allows a taking to achieve such discrimination.   But courts do not need to search the motives of public officials who prefer a public park to an eyesore in the form of a large hardware store with the prospect of 80 vehicles at a time parked and circling.

Second, the dissent attempts to cloud the issue of public purpose by positing that other motives for creating the park render the park itself a "Fake Park."   Dissent at 2.   The dissent dilates on this point elsewhere by calling the 1.7-acre passive-use park an "empty field."   Id. at 1.   This evasion betrays an urbanite prejudice that a park must contain a tennis court or a statue or a merry-go-round.   And that evasion is needed to promote the central error of the dissent, that the jostle of motives common to all legislation has not produced a public amenity.   The evasion is critical to the dissent because it is the public amenity that constitutes the public use for which the government can pay due compensation for private property.

So long as public land is open to the air and to the people, it is a park; and that, of all things, cannot be faked.   The author of the dissent may come to 12500

24

Main Road, Mattituck, NY, and he may walk the park, breathe its air, or spread his picnic upon it. There is nothing Fake about it.

The judgment of the District Court is **AFFIRMED**.

22-2722
*Brinkmann v. Town of Southold*

MENASHI, *Circuit Judge*, dissenting:

The court emphasizes that "[p]ublic parks have been recognized as a 'public use' for more than a century" and that a court should not "substitute its judgment for a legislature's judgment as to what constitutes a public use." *Ante* at 7-8. But no one disputes that a public park would be a public use. The plaintiffs instead argue that the Town of Southold *does not want a public park*. The court admits that the plaintiffs are right. The court acknowledges that the complaint in this case "alleges facts sufficient to support a finding that the decision to create the park was a pretext for defeating the Brinkmanns' commercial use" of their own property and that the Town decided to seize the Brinkmanns' property for a park only "after varied objections and regulatory hurdles that the Town interposed and that the Brinkmanns did or could surmount." *Id.* at 2. In other words, the Town did not like what the owners were doing with their property, but the Town was unable to muster the political support to pass a zoning law or to deny a permit. So the Town of Southold grabbed the land for itself.

The court excuses this evasion of lawful procedures on the ground that the Town announced it would turn the property it took away from the owners into an empty field—or, in the Town's preferred language, a "passive use park."[1] The Constitution has nothing to say, according to the court, "when a property is taken for a public amenity as a pretext for defeating the owner's plans for another use." *Ante* at 3.

---

[1] A "passive use park" is "a park with no significant facilities or improvements." J. App'x 29.

That is incorrect. In my view, the Constitution contains no Fake Park Exception to the public use requirement of the Takings Clause. A taking of property must be "for public use," U.S. Const. amend. V— or at least for "a public purpose," *Kelo v. City of New London*, 545 U.S. 469, 478 (2005)—and thwarting the rightful owner's lawful use of his property is not a public purpose. I dissent.

**I**

The court appears to recognize that preventing an owner from lawfully using his own property is not a valid public purpose. That is why the court's decision depends on the Town lying about its purpose. If the Town of Southold had—openly and honestly— explained that the reason it seized the Brinkmanns' property was to stop the owners from using their property in a lawful way, it would not be possible for the court to say that the taking was "for a public amenity." *Ante* at 3. But because the Town has said it will put a park on the Brinkmanns' property—at least initially, as there is no requirement that the Town *maintain* the park for any length of time— the court says it does not care about the actual purpose of the taking. In this way, the court's decision grants governments virtually unlimited power over private property—as long as the governments are willing to act in bad faith.

The court defends this new doctrine on the ground of workability. It invokes Justice Scalia describing the difficulty of ascribing subjective motivations to a multimember legislature. *See id.* at 11 ("[D]iscerning the subjective motivation of [a legislative body] is, to be honest, almost always an impossible task.") (alteration in original) (quoting *Edwards v. Aguillard*, 482 U.S. 578, 636 (1987) (Scalia, J., dissenting)). In fact, Justice Scalia wrote that "it *is* possible to discern the objective 'purpose' of a statute (*i.e.*, the public good at

2

which its provisions appear to be directed)" but "discerning the subjective motivation of *those enacting the statute* is, to be honest, almost always an impossible task." *Edwards*, 482 U.S. at 636 (Scalia, J., dissenting) (emphasis added). In this case, the Brinkmanns rely on allegations that the objective purpose behind the Town's decision to seize the property was interference with their lawful use, and the court even agrees that their allegations are plausible. "Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor," and that is true here. *Washington v. Davis*, 426 U.S. 229, 253 (1976) (Stevens, J., concurring). The allegations describe the outward conduct of the Town, and the record does not reflect any divergent motivations among the relevant public officials. *See infra* Part IV.

Courts frequently examine the purpose of government action when evaluating constitutional claims. *See, e.g., Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."); *Masterpiece Cakeshop, Ltd. v. Colorado Civ. Rts. Comm'n*, 584 U.S. 617, 638 (2018) (describing "the State's duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint"); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) ("There are, of course, many ways of demonstrating that the object or purpose of a law is the suppression of religion or religious conduct."); *Allen v. Milligan*, 599 U.S. 1, 11 (2023) ("The Fifteenth Amendment … prohibits States from acting with a 'racially discriminatory motivation' or an 'invidious purpose' to discriminate."); *National Pork Producers Council v. Ross*, 598 U.S. 356, 364 (2023) ("[U]nder this Court's dormant Commerce Clause decisions, no State may use its

laws to discriminate *purposefully* against out-of-state economic interests.") (emphasis added); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 476 (1981) (Powell, J., concurring in part and dissenting in part) (contrasting "the *avowed* legislative purpose of the statute" with "the legislature's actual purpose"); *Batson v. Kentucky*, 476 U.S. 79, 99 (1986) (concluding that judicial inquiries into the purpose of peremptory challenges would not "create serious administrative difficulties"); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994) ("[A] content-based purpose may be sufficient in certain circumstances to show that a regulation is content based."); *Wallace v. Jaffree*, 472 U.S. 38, 56 (1985) ("[T]he First Amendment requires that a statute must be invalidated if it is entirely motivated by a purpose to advance religion."); *Smith v. Doe*, 538 U.S. 84, 92 (2003) ("If the intention of the legislature was to impose punishment, that ends the inquiry.").[2]

In short, "[i]nquiring into legislative purpose … is a common feature of judicial review, so there is no reason to expect such an inquiry to prove unworkable only in this context."[3] The court even concedes that the Takings Clause, like these other constitutional provisions, *requires* an inquiry into the purpose behind the taking—at least sometimes. The court recognizes that a taking would be unlawful if "the exercise of eminent domain supposedly for a park had been pretext for an intention to use taken property for a different—and private—purpose," that is, for a purpose "to confer [a]

---

[2] In reviewing agency action under the Administrative Procedure Act, moreover, courts determine "when an improper motive has influenced the decisionmaking process." Merrick B. Garland, *Deregulation and Judicial Review*, 98 Harv. L. Rev. 505, 556 (1985).

[3] Steven Menashi & Douglas H. Ginsburg, *Rational Basis with Economic Bite*, 8 NYU J.L. & Liberty 1055, 1101 (2014).

private benefit." *Ante* at 8. In this way, the court recognizes that an inquiry into purpose is both workable and appropriate when considering *some* claims under the Takings Clause. When we consider a claim of a regulatory taking under the Takings Clause, we similarly consider whether "[t]he Town's alleged conduct was unfair, unreasonable, and in bad faith." *Sherman v. Town of Chester*, 752 F.3d 554, 565 (2d Cir. 2014) (applying the *Penn Central* factors). In particular, we must determine whether "the Town singled out [the owner's] development, suffocating him with red tape to make sure he could never succeed in developing [his property]." *Id.*[4] That inquiry parallels the Brinkmanns' claim in this case that the alleged purpose behind the pretextual park is the bad faith intention to prevent the owner's lawful use. There is no justification for deciding that this familiar type of judicial inquiry is unworkable in this case.

## II

We know that identifying such a bad faith purpose is workable because a large body of case law establishes that courts must invalidate a pretextual taking in just these circumstances.

## A

The court's decision today creates a split with the decisions of several state supreme courts. The Connecticut Supreme Court, for example, has said that "there is no merit" to the argument "that a

---

[4] *See also MHC Fin. Ltd. P'ship v. City of San Rafael*, No. 00-3785, 2006 WL 3507937, at *12 (N.D. Cal. Dec. 5, 2006) ("The final *Penn Central* factor—the character of the government action … depends on whether the property owner has been 'singled out' to bear a public burden, perhaps due to bad faith on the part of the government, or has been called upon to provide a public benefit rather than to avoid injury to other persons.") (citing *E. Enters. v. Apfel*, 524 U.S. 498, 537 (1998) (plurality opinion)), *rev'd in part*, 714 F.3d 1118 (9th Cir. 2013).

violation of the public use requirement is limited to situations in which the government takes private property for a use that is not a public use." *New England Ests., LLC v. Town of Branford*, 294 Conn. 817, 854 (2010). Rather, "[i]t is well established … that a government actor's bad faith exercise of the power of eminent domain is a violation of the takings clause," and indeed "many state courts have found a violation of the takings clause on the basis of a bad faith exercise of the power of eminent domain." *Id.* (citing cases).

In *New England Estates*, the Connecticut Supreme Court considered a Takings Clause challenge involving circumstances similar to this case: the owner sought to build an affordable housing development on its property, but the town "was not receptive to an affordable housing development." *Id.* at 826. It seized the property, "claiming that its reasons for the taking were to investigate and to remediate any environmental contamination on the property, and for the possible development of playing fields, when in fact the town's real purpose was to prevent the proposed residential development of the property." *Id.* at 841. A jury agreed that "in taking the land, the town either acted in bad faith, taking the land for pretextual reasons, acted unreasonably, or in an abuse of its power," and the Connecticut Supreme Court held that such a pretextual taking violates the public use requirement of the Takings Clause. *Id.* at 854.

The Georgia Supreme Court considered a case in which the property owner had sought to construct a hazardous waste facility and alleged that the condemnation of its property was "undertaken in bad faith and for the sole purpose of defeating the construction of the hazardous waste facility." *Earth Mgmt., Inc. v. Heard Cnty.*, 248 Ga. 442, 446 (1981). The Georgia Supreme Court acknowledged that the county's purported purpose—establishing a public park—was a public purpose and that "the court is in no position to second-guess

6

Heard County as to the size and scope of a park for its people." *Id.* But the court went on to consider "whether the action of the county commissioner in condemning this parcel of land was taken for the purpose of building a public park or whether this was a mere subterfuge utilized in order to veil the real purpose of preventing the construction of a hazardous waste disposal facility." *Id.* at 446-47. The court concluded as follows:

> Even fully considering the evidence relied upon by Heard County, the inescapable conclusion is that although a public park is a legitimate public use for real estate, the appropriation of this land for that purpose was not the true reason for the institution of the condemnation proceeding here. We can only conclude that Heard County instituted the condemnation proceeding for the obvious purpose of preventing the land from being used as a hazardous waste facility. Such action is beyond the power conferred upon the county by law and amounts to bad faith.

*Id.* at 448. In a subsequent case, the Georgia Supreme Court similarly concluded that the evidence supported "the finding of the trial judge that the sole commissioner directed the filing of the condemnation not because of a need for a public safety training facility, but to block the City of Bremen's planned facility." *Carroll County v. City of Bremen*, 256 Ga. 281, 282 (1986). The Georgia Supreme Court invalidated the taking because "[t]he condemning authority of a county may not be used simply to block legitimate public activity." *Id.* And it explained that a government may not use eminent domain to avoid normal democratic procedures for regulating the use of property. *See id.* at 282-83 ("While there was nothing improper in the acts of the Commission in speaking out against the facility and in urging the public to express opposition to the state licensing authority, it was

7

improper to use the condemnation authority to block the plant when other avenues failed.").

Other state courts have similarly invalidated pretextual takings in circumstances similar to this case. *See Middletown Township v. Lands of Stone*, 595 Pa. 607, 617 (2007) ("Recreational use must be the true purpose behind the taking or else the Township simply did not have the authority to act, and the taking was void *ab initio*."); *R.I. Econ. Dev. Corp. v. Parking Co.*, 892 A.2d 87, 104 (R.I. 2006) ("[T]he condemnation … was inappropriate, motivated by a desire for increased revenue and was not undertaken for a legitimate public purpose."); *Essex Fells v. Kessler Inst. for Rehab.*, 673 A.2d 856, 860-61 (N.J. Super. 1995) (Fuentes, J.) (explaining that "the decision to condemn shall not be enforced where there has been a showing of improper motives, bad faith, or some other consideration amounting to a manifest abuse of the power of eminent domain" and specifically "where a condemnation is commenced for an apparently valid, stated purpose but the real purpose is to prevent a proposed development which is considered undesirable, the condemnation may be set aside") (internal quotation marks omitted); *Pheasant Ridge Assocs. v. Town of Burlington*, 399 Mass. 771, 776 (1987) ("Bad faith in the use of the power of eminent domain is not limited to action taken solely to benefit private interests. It includes the use of the power of eminent domain solely for a reason that is not proper, although the stated public purpose or purposes for the taking are plainly valid ones."); *In re Hewlett Bay Park*, 265 N.Y.S.2d 1006, 1010 (N.Y. Sup. Ct. 1966) ("This court has come to the conclusion that the real purpose of this condemnation proceeding in larger part is not to use this property for something affirmative, so much as it is to prevent its use for something else which the village authorities regard as undesirable. Such is a perversion of the condemnation process.").

Still other state courts, even when allowing a taking, have reaffirmed the principle that a pretextual or bad faith taking is impermissible. *See, e.g.*, *Norwood v. Horney*, 110 Ohio St. 3d 353, 373-74 (2006) ("There can be no doubt that our role—though limited—is a critical one that requires vigilance in reviewing state actions for the necessary restraint, including review to ensure … that the state proceeds fairly and effectuates takings without bad faith, pretext, discrimination, or improper purpose."); *City of Las Vegas Downtown Redev. Agency v. Pappas*, 119 Nev. 429, 448 (2003) ("A property owner may raise, as an affirmative defense to the taking, that … the avowed public purpose is merely a pretext or used in bad faith.") (footnotes omitted).

**B**

The court quibbles that some of these cases applied a mixture of the federal Takings Clause and state law analogues. *See ante* at 13-19. There are three problems with this objection.

First, the longstanding body of law in the state courts undermines the argument that it is "impossible" for a court to determine whether "a government actor had bad reasons" for taking property—at least when the allegedly improper purpose is the prevention of the owner's lawful use (as opposed to the covert purpose to benefit a private party, which the court says it is perfectly capable of ferreting out). *Id*. at 11. To the extent that the court provides a rationale for its decision today, it is that courts must defer to a government's judgment because inquiring into purpose would be unworkable. Yet the experience of the state courts shows that it is not.[5]

---

[5] *Cf.* Jeffrey S. Sutton, Who Decides?: States as Laboratories of Constitutional Experimentation 222 (2022) (arguing, in the context of

9

Second, the state courts adopted the prohibition on pretextual takings from the federal courts. In applying the principle, the Massachusetts Supreme Judicial Court observed that "the Federal courts have recognized the possibility that a condemnation may be arbitrary, capricious, or in bad faith." *Pheasant Ridge*, 399 Mass. at 776. And it was correct.

Our own court, for example, rejected a challenge to a federal condemnation because the condemnation was for "a legitimate public use" and could not be construed "as either arbitrary or capricious or an evidence of bad faith." *United States v. New York*, 160 F.2d 479, 481 (2d Cir. 1947).[6] The Supreme Court similarly said that a taking would be invalid "if the designated officials had acted in bad faith or so 'capriciously and arbitrarily' that their action was without adequate determining principle or was unreasoned." *United States v. Carmack*, 329 U.S. 230, 243 (1946).

At least five other circuits have recognized the same prohibition on pretextual or bad faith takings. *See United States v. 101.88 Acres of Land*, 616 F.2d 762, 767 (5th Cir. 1980) ("The court may ask in this inquiry whether the authorized officials were acting in bad faith or arbitrarily or capriciously by condemning given land."); *United States v. 58.16 Acres of Land*, 478 F.2d 1055, 1058 (7th Cir. 1973) ("The determination of whether the taking of private property is for a

administrative law, that "[t]he state experiences defeat some of the federal explanations for … continuing to embrace a broad deference model") (emphasis omitted).

[6] *See also Goldstein v. Pataki*, 516 F.3d 50, 63 (2d Cir. 2008) (recognizing "the possibility that a fact pattern may one day arise in which the circumstances of the approval process so greatly undermine the basic legitimacy of the outcome reached that a closer *objective* scrutiny of the justification being offered is required").

public use may appropriately and materially be aided by exploring the good faith and rationality of the governmental body in exercising its power of eminent domain."); *S. Pac. Land Co. v. United States*, 367 F.2d 161, 162 (9th Cir. 1966) ("[T]he Supreme Court itself has declined to rule out the possibility of judicial review where the administrative decision to condemn a particular property or property interest is alleged to be arbitrary, capricious, or in bad faith. And various courts of appeal, including this one, have said that an exception to judicial non-reviewability exists in such circumstances.") (emphasis and citation omitted); *Wilson v. United States*, 350 F.2d 901, 907 (10th Cir. 1965) ("*In the absence of bad faith*, … if the use is a public one, the necessity for the desired property as a part thereof is not a question for judicial determination.") (emphasis added); *United States v. 64.88 Acres of Land*, 244 F.2d 534, 536 (3d Cir. 1957) ("It is well established that, *absent bad faith* which is not argued here, the government's determination and explicit assertion of the nature and extent of the estate to be taken are not judicially reviewable.") (emphasis added).

It is difficult to maintain that the "bad faith" limitation on the eminent domain power is a creature of state law when the state courts adopted the limitation from federal law.

Third, there is no reason to expect significant divergence between the federal Takings Clause and a state law analogue because both provisions codify a pre-existing common-law right. As the Georgia Supreme Court once explained, "the amended Constitution of the United States, which declares 'private property shall not be taken for public use without just compensation,' does not create or declare any *new principle of restriction*, either upon the legislation of the National or State governments, but simply recognised the existence of a great common law principle, founded in natural justice, especially applicable to all republican governments." *Young v.*

11

*McKenzie,* 3 Ga. 31, 44 (1847).[7] The right was recognized in the Magna Carta,[8] and it was protected in the colonies and the early republic before the ratification of the Bill of Rights.[9] When a constitutional provision was "understood to codify a pre-existing right, rather than to fashion a new one," its scope generally corresponds to those of "state analogues." *District of Columbia v. Heller*, 554 U.S. 570, 603, 626

---

[7] *See also Henry v. Dubuque & P.R. Co.*, 10 Iowa 540, 543-44 (1860) ("The plaintiff needed no constitutional declaration to protect him in the use and enjoyment of his property against any claim or demand of the company to appropriate the same to their use, or the use of the public. To be thus protected and thus secure in the possession of his property is a right inalienable, a right which a written constitution may recognize or declare, but which existed independently of and before such recognition, and which no government can destroy.").

[8] Magna Carta art. XXVIII ("No constable or other royal official shall take corn or other movable goods from any man without immediate payment, unless the seller voluntarily offers postponement of this."); *see also Young*, 3 Ga. at 44 (tracing the right "to *Magna Charta*, the learned commentaries of *Blackstone* on the common law, and the opinions of the distinguished jurists and eminent judges of our own country").

[9] *See* James W. Ely Jr., *"That Due Satisfaction May Be Made:" The Fifth Amendment and the Origins of the Compensation Principle*, 36 Am. J. Legal Hist. 1, 4 (1992) ("[B]oth colonial and post-Revolutionary practice, as well as constitutional theory, supported the compensation requirement."); William B. Stoebuck, *A General Theory of Eminent Domain*, 47 Wash. L. Rev. 553, 583 (1972) ("[C]ompensation was the regular practice in England and America, as far as we can tell, during the whole colonial period."); J.A.C. Grant, *The "Higher Law" Background of the Law of Eminent Domain*, 6 Wis. L. Rev. 67, 71 (1931) ("[U]nder the banner of a 'higher law,' the courts declared themselves to be the guardians of the sanctity of vested rights in property against their appropriation for other than a public use or without just compensation."); *see also Norwood*, 110 Ohio St. 3d at 364 ("[A]lmost every state constitution eventually included provisions related to eminent-domain powers.").

(2008). The state analogues inform the meaning of the public use requirement. The alternative approach would treat the federal Takings Clause as an "odd outlier, protecting a right unknown in state constitutions or at English common law." *Id.* at 603.[10]

### III

Despite the large body of state and federal law suggesting otherwise, the court announces that "courts do not inquire into alleged pretexts," *ante* at 3—again with the proviso that courts *do*

---

[10] The court suggests that the state provisions are not sufficiently analogous, but the state cases apply the federal Takings Clause, a similarly worded state constitutional provision that imposes a public use requirement, or both. *See New England Ests.*, 294 Conn. at 853 (applying the Fifth Amendment); *Earth Mgmt.*, 248 Ga. at 446 (applying state constitutional principle that "no private property shall be taken except for a public purpose"); *Middletown Township*, 595 Pa. at 617 (noting that the federal Takings Clause provides that "without a public purpose, there is no authority to take property from private owners," and that the Pennsylvania Supreme Court "has looked for the 'real or fundamental purpose' behind a taking"); *R.I. Econ. Dev.*, 892 A.2d at 96 (explaining that "both the United States Constitution and the Rhode Island Constitution" provide that "private property may be taken only for public uses"); *Essex Fells*, 673 A.2d at 860 (relying on both the federal Takings Clause and the state constitutional provision providing that "[p]rivate property shall not be taken for public use without just compensation") (quoting N.J. Const. art. I, ¶ 20); *Pheasant Ridge Assocs.*, 399 Mass. at 775-76 (relying on federal and state case law proscribing bad faith takings); *Hewlett Bay Park*, 265 N.Y.S.2d at 1007 (considering petition to set aside a taking "as not having been made in good faith nor for a public purpose as required by the Constitutions of the State of New York and of the United States of America"); *Norwood*, 110 Ohio St. 3d at 364 (discussing "the limitations of public use and compensation" in the federal and state constitutions); *Pappas*, 119 Nev. at 434 ("Both the United States and Nevada Constitutions allow the taking of private property for public use provided just compensation is paid to the private property owner.").

inquire when the alleged pretext is conferring a private benefit, *id.* at 8. The court acknowledges that the Supreme Court and the federal circuit courts have previously said that bad faith takings violate the Takings Clause. *Id.* at 20-21 (citing *S. Pac. Land Co.*, 367 F.2d at 162; *Carmack*, 329 U.S. at 243-44). But the court decides that those cases have been overruled. "That may have been so in 1966, but it is not so now," the court says, because "[t]he Supreme Court's current pronouncement on 'pretext' concerns only the pretext of non-public (that is, private) use." *Id.* at 21 (citing *Kelo*, 545 U.S. at 478). In fact, neither *Kelo* nor our court's decision in *Goldstein* discarded the longstanding prohibition on pretextual, bad faith takings.

## A

In *Kelo*, the Supreme Court stated that a government is not "allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit." *Kelo*, 545 U.S. at 478. Today's decision interprets this statement to mean that the *only* impermissible pretext is bestowing a private benefit. But *Kelo* addressed the issue of a private benefit because the taking at issue in that case involved the transfer of property "from one private party to another." *Id.* at 477. The petitioners argued that the actual purpose of the taking was to bestow a private benefit.

The trial court explained that "[w]here the purpose … is economic development and that development is to be carried out by private parties or private parties will be benefited, the court must decide if the stated public purpose—economic advantage to a city sorely in need of it—is only incidental to the benefits that will be conf[err]ed on private parties of a development plan." *Kelo v. City of New London*, No. 557299, 2002 WL 500238, at *36 (Conn. Super. Ct. Mar. 13, 2002). And the trial court "conducted a careful and extensive inquiry" in which:

14

[t]he trial court considered testimony from government officials and corporate officers, documentary evidence of communications between these parties, respondents' awareness of New London's depressed economic condition and evidence corroborating the validity of this concern, the substantial commitment of public funds by the State to the development project before most of the private beneficiaries were known, evidence that respondents reviewed a variety of development plans and chose a private developer from a group of applicants rather than picking out a particular transferee beforehand, and the fact that the other private beneficiaries of the project are still unknown because the office space proposed to be built has not yet been rented.

*Kelo*, 545 U.S. at 491-92 (Kennedy, J., concurring) (citations omitted). The trial court "concluded, based on these findings, that benefiting [the private party] was not 'the primary motivation or effect of this development plan,'" *id.* at 492, and the Supreme Court agreed, *see id.* at 478 (majority opinion) ("The trial judge and all the members of the Supreme Court of Connecticut agreed that there was no evidence of an illegitimate purpose in this case.").

If the alleged illegitimate purpose in *Kelo* had not been the bestowal of a private benefit but the obstruction of the owner's lawful use, then the trial court and the Connecticut Supreme Court would have considered whether there was evidence of *that* impermissible purpose. We know that because the Connecticut Supreme Court has specifically held that the public use requirement of the federal Takings Clause is not "limited to situations in which the government takes private property for a use that is not a public use" but is violated when a government "either acted in bad faith, taking the land for pretextual reasons, acted unreasonably, or in an abuse of its power." *New England Ests.*, 294 Conn. at 854. In particular, a municipal

15

government "violate[s] the public use requirement by being dishonest about the reasons for which it took the land" because "[i]t is well established … that a government actor's bad faith exercise of the power of eminent domain is a violation of the takings clause." *Id*.

The Supreme Court's specific mention of private benefits reflected the record before it.[11] It cannot be read to sweep away the pre-existing body of federal or state law that other types of pretextual takings violate the public use requirement. Certainly, the Connecticut Supreme Court does not understand *Kelo* to have done that:

> [R]eliance on *Kelo v. New London* for the proposition that only a taking for the purpose of conferring a benefit on a private party constitutes a violation of the public use requirement, interprets that decision overbroadly. *Kelo* did not involve any allegations that the city of New London acted in bad faith in taking private property. Therefore, the issue of whether a bad faith taking would violate the public use requirement was not before the court.

*New England Ests.*, 294 Conn. at 854 n.28 (citations omitted).[12] In short, that sentence from *Kelo* cannot bear the weight the court puts on it.

---

[11] *See Goldstein*, 516 F.3d at 61 ("[T]he Supreme Court's guidance in *Kelo* need not be interpreted in a vacuum.").

[12] *See also New England Ests.*, 294 Conn. at 854 ("Although the United States Supreme Court has not yet addressed this issue directly, we agree with those jurisdictions concluding that the public use clause should not be interpreted so narrowly. Indeed, many state courts have found a violation of the takings clause on the basis of a bad faith exercise of the power of eminent domain.").

16

**B**

The court puts additional weight on *Goldstein*, suggesting that our court has discarded earlier case law prohibiting bad faith takings.[13] In fact, *Goldstein* does not do that either.

*Goldstein* involved a claim similar to *Kelo*: property was condemned for an economic development project, and the owners alleged that the government's "claims of public benefit are a pretext to justify a private taking," Brief for Plaintiffs-Appellants at 14, *Goldstein v. Pataki*, 516 F.3d 50 (2d Cir. 2008) (No. 07-2537), 2007 WL 6158382, concealing the actual purpose to "enrich[] the private individual who proposed [the project] and stands to profit most from its completion," 516 F.3d at 53.

If the allegations had been plausible, there is no question that the property owners would have stated a claim. Even today's decision acknowledges that a property owner would survive a motion to dismiss based on plausible allegations that the actual purpose of a taking was to confer a private benefit. Thus, we affirmed the dismissal of the complaint not because pretextual takings are permissible but because the allegations of pretext were "conclusory." *Id.* at 56, 63. The owners "failed to allege … any specific illustration of improper dealings between [the private developer] and the pertinent government officials," even though the claim of pretext depended on showing that the officials aimed to benefit the developer. *Id.* at 64. We

---

[13] *But see Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of [the Supreme Court] has direct application in a case, … the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *Jones v. Coughlin*, 45 F.3d 677, 679 (2d Cir. 1995) ("A decision of a panel of this Court is binding unless and until it is overruled by the Court *en banc* or by the Supreme Court.").

declined to allow "such a claim to go forward, founded on mere suspicion." *Id.* at 62.

In *Goldstein*, "even if Plaintiffs could prove every allegation in the Amended Complaint, a reasonable juror would not be able to conclude that the public purposes offered in support of the Project were 'mere pretexts' within the meaning of *Kelo*." *Id.* at 55 (alteration omitted) (quoting *Goldstein v. Pataki*, 488 F. Supp. 2d 254, 288 (E.D.N.Y. 2007)). That case does not resemble this one, in which our panel unanimously agrees that "[t]he complaint alleges facts sufficient to support a finding that the decision to create the park was a pretext." *Ante* at 2.

The court relies heavily on a sentence from *Goldstein* to the effect that "review of a legislature's public-use determination is limited such that where the exercise of the eminent domain power is rationally related to a conceivable public purpose, the compensated taking of private property is not proscribed by the Constitution." *Id.* at 9 (alterations omitted) (quoting *Goldstein*, 516 F.3d at 58). Here is that sentence in context:

> The Supreme Court has therefore instructed lower courts not to "substitute [their] judgment for a legislature's judgment as to what constitutes a public use 'unless the use be palpably without reasonable foundation.'" *To that end*, we have said that our review of a legislature's public-use determination is limited such that "'where the exercise of the eminent domain power is rationally related to a conceivable public purpose,' ... the compensated taking of private property for urban renewal or community redevelopment is not proscribed by the Constitution."

*Goldstein*, 516 F.3d at 58 (emphasis added) (citations omitted). The context shows that judicial deference to the legislature is appropriate

with respect to "what constitutes a public use," not with respect to the distinct question of whether the purported public use was genuine or pretextual. In this case, no one disputes that a park would be a public use if it were the Town's actual purpose.

Moreover, it is worth emphasizing—as Justice Kennedy did in *Kelo*—that "[t]he determination that a rational-basis standard of review is appropriate" does not "alter the fact" that pretextual takings "are forbidden by the Public Use Clause." *Kelo*, 545 U.S. at 490 (Kennedy, J., concurring). Thus, "[a] court applying rational-basis review under the Public Use Clause should strike down a taking" shown to be pretextual, "just as a court applying rational-basis review under the Equal Protection Clause must strike down a government classification that is clearly intended to injure a particular class of private parties, with only incidental or pretextual public justifications." *Id.* at 491 (citing *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446-47, 450 (1985); *Dep't of Agric. v. Moreno*, 413 U.S. 528, 533-36 (1973)). In this way, the *Kelo-Goldstein* standard still means that "[a] court confronted with a plausible accusation" of an impermissible pretextual taking "should treat the objection as a serious one and review the record to see if it has merit" and should conduct "a careful and extensive inquiry." *Id.*

Subsequent to *Kelo* and *Goldstein*, a district court in our circuit considered allegations of a pretextual, bad faith taking that did not involve the transfer of a private benefit. In *Wellswood Columbia, LLC v. Town of Hebron*, the plaintiffs alleged that the actual "purpose of the defendant Town of Hebron's actions in taking the Plaintiffs' property was to interfere with the Plaintiffs' lawful and economically productive use and development of the Property." No. 10-CV-01467, 2013 WL 5435532, at *3 (D. Conn. Sept. 30, 2013). The district court, relying on *New England Estates*, explained that "if Plaintiff has indeed

19

pled a distinct bad faith takings claim pursuant to the public use requirement of the Fifth Amendment, such a claim is properly before this court." *Id.* at *2. If *Kelo* or *Goldstein* overruled the longstanding prohibition on bad faith takings, that would be news to several courts.[14]

## IV

How plausible were the allegations of pretext in this case? "We review a district court's grant of a motion to dismiss *de novo*, accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 147 (2d Cir. 2021) (quoting *Henry v. County of Nassau*, 6 F.4th 324, 328 (2d Cir. 2021)).

---

[14] *See, e.g.*, *Roxul USA, Inc. v. Bd. of Educ.*, No. 19-CV-54, 2019 WL 2016866, at *3 (N.D. W. Va. May 7, 2019) ("[T]he Fifth Amendment presupposes that the state acted in pursuit of a valid purpose. Although the Court agreed that the BOE's *claimed* reason for the taking would constitute a public use—as the BOE stated it intended to build a school facility to meet the community's educational needs—the Court found that the BOE's actions lacked any legitimate government interest, were motivated by animus, and were arbitrary, capricious, and in bad faith.") (emphasis added); *United States v. 5.0 Acres of Land*, No. 04-C-4325, 2008 WL 4450315, at *4 (N.D. Ill. Sept. 30, 2008) ("[T]he Supreme Court has not ruled out the possibility of judicial review where the administrative decision to condemn a particular property or property interest is alleged to be arbitrary, capricious, or in bad faith. Seventh Circuit caselaw recognizes that an exception exists to the general powerlessness of courts to review eminent domain takings in circumstances of bad faith or abuse of discretion. It has stated that when 'questions of bad faith, arbitrariness, and capriciousness [have been raised], the district court [is] required to resolve those questions.'") (citations omitted) (quoting *58.16 Acres of Land*, 478 F.2d at 1059) (citing *Carmack*, 329 U.S. at 243-44; *United States v. Meyer*, 113 F.2d 387, 392 (7th Cir. 1940)).

**A**

In order to build a hardware store on their property in Southold, the Brinkmanns sought to comply with the requirements of the Town. In May 2017, the Brinkmanns met with the Southold Town Planning Department to convey their plan for the vacant lot. S. App'x 2. The Brinkmanns then had two meetings, in July and September 2017, with the Mattituck-Laurel Civic Association. J. App'x 17. At the September meeting, some residents expressed concerns about traffic, and the Brinkmanns volunteered to pay for traffic studies. *Id.* at 17-18.[15] The Brinkmanns had additional discussions about the plan with the Town Planning Department—and made two separate rounds of revisions based on those discussions—before submitting a formal application to build the hardware store to the Town Building Department. J. App'x 18. Nonetheless, the Building Department ultimately denied their formal permit application on the ground that the Planning Department had not formally approved the site plan. *Id.* at 18-19. In 2018, the Brinkmanns' architects completed their designs, complying with the Planning Department's request that the Brinkmanns' proposed buildings abut the main road and provide space for parking in the back; the Brinkmanns and their architects then met with the Planning Department for a preliminary meeting and submitted the application for site-plan approval. *Id.* at 19.

Meanwhile, the Town imposed additional requirements. In June 2018, the Town informed the Brinkmanns that they needed to obtain a Special Exception Permit, which involved a $1,000 fee, and a Market and Municipal Impact Study ("Study") at a cost later determined to be $30,000. *Id.*; S. App'x 3. Only after the sixteen-month

---

[15] The traffic study was completed in 2020 and concluded that the Brinkmanns' proposal would not create a traffic problem. J. App'x 18.

back-and-forth with the Brinkmanns over the proposed hardware store did the Town Board, in September 2018, first vote to purchase the Brinkmanns' property for the purpose of stopping the construction of the hardware store. J. App'x 22. The Town also tried intimidation. In October 2018, Scott Russell, the Town Supervisor, called the president of the Bridgehampton National Bank to pressure him not to sell the property to the Brinkmanns—despite the Bank's contractual obligation to complete the sale—and instead to sell it to the Town. *Id.* at 24. After this pressure failed, Assistant Town Attorney Donna Hagen called the Bank's attorney to pressure the Bank not to sell to the Brinkmanns. *Id*.

After its efforts to intimidate the Bank failed, the Town contrived additional regulatory hurdles, even after the Brinkmanns complied with the Town's demand for $30,000 for the Study in January 2019. *Id.* at 25. Just six weeks later, in February 2019, the Town enacted a six-month building permit moratorium on a one-mile stretch of road that covered the Brinkmanns' property. *Id*. During this six-week period, the Town did not begin work on the Study, which it was required to conduct within 90 days of receiving the application. *Id.* at 25-26; *see* Town of Southold City Code § 280-45(B)(10)(b). The Town twice extended the six-month building moratorium in August 2019 and July 2020 even though, at both times, Suffolk County recommended that the Town disapprove the extensions because no evidentiary support justified the moratorium. *Id.* at 26-27. The moratorium was not strictly enforced—at least for other properties. *Id.* at 27-28. Despite the small size of the area subject to the moratorium, the Town granted at least three waivers for other properties while it was in effect—suggesting that the moratorium targeted one particular property. *Id.* at 27-28.

22

The Brinkmanns plausibly allege that the Town sought to stop construction of their hardware store.

**B**

The Brinkmanns also plausibly allege that the Town's stated purpose of a public park was pretextual. The Town expressed no interest in acquiring the property for a park in 2011 when the property was up for sale or during the five years that the property sat vacant under the Bank's ownership. *Id.* at 15-16. Throughout the Brinkmanns' discussions with the Town, no one communicated to the Brinkmanns any interest in placing a park on the property. No one mentioned such an interest during the meeting with the Civic Association, *id.* at 18; in communications with the Town Building Department, *id.* at 19; or when the Town required the Brinkmanns to pay $30,000 for the Market and Municipal Impact Study, *id.* at 20. At the time the Town Board voted to purchase the property from the Brinkmanns, it was clear that the Town was not proposing the purchase for the purpose of constructing a park because at that time the Town had not:

> engaged in any planning for a public park on the property; had not tasked any Town committee with evaluating the possibility of a new public park on the property; had not tasked any Town planning staff with evaluating the possibility of a new public park on the property; had not conducted any financial analyses of creating a new park on the property; had not evaluated any alternative location for a new public park somewhere other than the property (including, for example, the possibility of purchasing the undeveloped land for sale next to the property); had not surveyed Town citizens or held stakeholder meetings with citizens about purchasing the property for a new park; had not

23

conducted any geotechnical survey of the property to determine its suitability for a public park; had not held any public hearings about creating a new public park on the property; had not retained any outside consultants to evaluate the property as a location for a new public park; and had not retained any architects, contractors, traffic engineers, or landscapers to evaluate the property or design and build a new park on the property.

*Id.* at 22-23. When he attempted to pressure the Bank in 2018 to sell the property to the Town rather than to the Brinkmanns, the town supervisor never mentioned a goal of building a park on the property, instead saying, "I will never allow anything to be built on that property." *Id.* at 24.[16] Moreover, at the time the Brinkmanns filed their complaint, there was an undeveloped plot next to the Brinkmanns' property that the Town could have turned into a park but never expressed any interest in acquiring. J. App'x 23-24.

Sarah E. Nappa, a member of the Southold Town Board, published an op-ed in the local newspaper entitled "Eminent domain decision sets dangerous precedent," describing why she voted against seizing the property.[17] In the op-ed, she never even suggests anyone wanted a park at the location.[18] Instead, she acknowledges that the

---

[16] The court cites this statement as evidence that the Town had no impermissible purpose in seizing the property, *see ante* at 8, but the statement evidences (1) the Town's purpose to obstruct the Brinkmanns' lawful use of the property and (2) the lack of a plan to build a park, the ostensible public use.

[17] Sarah Nappa, *Guest Column: Eminent Domain Decision Sets a Dangerous Precedent*, Suffolk Times (Sept. 19, 2020), *available at* https://perma.cc/7YD2XQ4X. The column is quoted in the complaint. *See* J. App'x 29-30; *see also id*. at 1097 (noting Nappa's vote against the seizure).

[18] *See* Nappa, *supra* note 17.

24

decision was based on the Town's opposition to the hardware store. Because "[a] comprehensive [Town] plan has been languishing for over 10 years, and although it is finally completed and adopted, it is still not implemented," she writes, "I completely understand and see the desperation that the members of this community have and feel that this drastic action is the only thing they have left." However, she objects to using eminent domain "simply because this administration couldn't get its act together" to amend the town code through lawful procedures. "[T]his is privately owned land that the owners purchased with certain legal rights intact. They are not asking for anything beyond what the town code allows," Nappa writes. "If this town wants to prevent a certain size of business or not allow certain types of businesses in a certain zone, it needs to be written in the code." But instead of passing such a law, the Town seized the Brinkmanns' property to prevent their lawful use of it:

> I can't help but wonder, if this application had been filed by anyone but an outsider, if this business was owned and operated by a member of the "old boys club," would the town still be seizing their private property? The use of eminent domain by Southold Town to take private property from an owner because it doesn't like the family or their business model is a dangerous precedent to set.[19]

There is no real dispute that the park was a pretext.

## C

Taken together, the allegations establish a violation of the public use requirement of the Takings Clause. The Brinkmanns plausibly allege "a fact pattern … in which the circumstances of the approval process so greatly undermine the basic legitimacy of the

---

[19] *Id.*

25

outcome that a closer *objective* scrutiny of the justifications being offered is required." *Goldstein*, 516 F.3d at 63. In particular, the Brinkmanns plausibly allege that the Town's stated "purpose of building a public park … was a mere subterfuge utilized in order to veil the real purpose" of preventing the owner's lawful use of the property. *Earth Mgmt.*, 248 Ga. at 447. Under the Takings Clause, towns are not "allowed to take property under the mere pretext of a public purpose," *Kelo*, 545 U.S. at 478, and the avowed public purpose "must be the true purpose behind the taking," *Middletown Township*, 595 Pa. at 617. This is because "where a condemnation is commenced for an apparently valid, stated purpose but the real purpose is to prevent a proposed development which is considered undesirable, the condemnation may be set aside," *Essex Fells*, 673 A.2d at 861. The complaint plausibly alleges that the actual purpose of the Town in seizing the property was to prevent the owners from building a hardware store on the property, which the local laws and regulations allowed them to do. When "the real purpose of [a] condemnation proceeding" is "to prevent [the property's] use for something else which the village authorities regard as undesirable," it "is a perversion of the condemnation process." *Hewlett Bay Park*, 265 N.Y.S.2d at 1010. "The condemning authority of a county may not be used simply to block legitimate public activity." *Carroll County*, 256 Ga. at 282.

Under these circumstances, "the designated officials … acted in bad faith." *Carmack*, 329 U.S. at 243. "Bad faith … includes the use of the power of eminent domain solely for a reason that is not proper, although the stated public purpose or purposes for the taking are plainly valid ones." *Pheasant Ridge Assocs.*, 399 Mass. at 776. We have said that a taking is invalid when there is "evidence of bad faith." *New York*, 160 F.2d at 481. The "well established" rule is "that a

26

government actor's bad faith exercise of the power of eminent domain is a violation of the takings clause," *New England Ests.*, 294 Conn. at 854, which requires the government to "effectuate[] takings without bad faith, pretext, discrimination, or improper purpose," *Norwood*, 110 Ohio St. 3d at 374. Because the complaint plausibly alleges that the Town of Southold seized property in bad faith for an improper purpose, it should survive a motion to dismiss.

*     *     *

"If ever there were justification for intrusive judicial review of constitutional provisions that protect 'discrete and insular minorities,' surely that principle would apply with great force to the powerless groups and individuals the Public Use Clause protects." *Kelo*, 545 U.S. at 521-22 (Thomas, J., dissenting) (citation omitted) (quoting *United States v. Carolene Products Co.*, 304 U.S. 144, 152, n.4 (1938)). During oral argument in this appeal, the Town frankly acknowledged that, under its view of the public use requirement, the Town could seize the homes of disfavored minorities—out of animus toward those minorities and a desire to drive them out of Southold—as long as the Town said it would build parks where the minorities' homes once stood.[20] Political majorities express animus toward all sorts of disfavored minorities, so I do not share the court's confidence that such an abuse of the eminent domain power would be redressable through "some *other* constitutional or statutory provision." *Ante* at 21. I would instead enforce the public use requirement of the Takings Clause.

The court's decision today demonstrates that even if one might think that prior cases have "constru[ed] the Public Use Clause to be a virtual nullity," *Kelo*, 545 U.S. at 506 (Thomas, J., dissenting), it is

---

[20] Oral Argument Audio Recording at 15:50 to 17:10.

possible to erode it further still. I would adhere to precedent providing that a pretextual, bad faith taking violates the public use requirement. Because the Brinkmanns plausibly allege that the Town effected the taking in bad faith for the impermissible purpose of thwarting the owners' lawful use of their property, I would reverse the judgment of the district court and allow their claim to proceed. Accordingly, I dissent.